**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

---

**MIRIAM BUTLER, individually and on**
**behalf of others similarly situated,**

        **Plaintiff,**                  **Civil Action No. _:19-cv-_____**
                                          **JURY DEMANDED**

**v.**

**THE TRAVELERS HOME AND MARINE**
**INSURANCE COMPANY and THE STANDARD**
**FIRE INSURANCE COMPANY,**

        **Defendants.**

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

COMES NOW Plaintiff Miriam Butler, individually and on behalf of all others similarly situated, and states and alleges the following for her Class Action Complaint and Jury Demand against The Travelers Home and Marine Insurance Company and The Standard Fire Insurance Company:

**PARTIES, RESIDENCY, JURISDICTION AND VENUE**

1.     Plaintiff Miriam Butler ("Butler" or "Plaintiff") is a citizen and resident of Columbia, South Carolina.  At all times relevant hereto, Butler owned a home located at 2132 Slighs Avenue, Columbia, South Carolina (the "Butler Home").

2.     Defendant The Travelers Home and Marine Insurance Company ("Travelers Home") is organized under the laws of the State of Connecticut and headquartered in Hartford, Connecticut. Travelers is authorized to sell property insurance policies in the State of South

Carolina and is engaged in the insurance business in the State of South Carolina, including Richland County.

3.      Defendant The Standard Fire Insurance Company ("Standard") is organized under the laws of the State of Connecticut and headquartered in Hartford, Connecticut. Standard is authorized to sell property insurance policies in the State of South Carolina and is engaged in the insurance business in the State of South Carolina, including Richland County.

4.      Both Travelers Home and Standard (collectively, "Travelers") are subsidiaries of and controlled by The Travelers Companies, Inc.

5.      Both Travelers Home and Standard engaged in the challenged claims handling practice in a uniform manner and pursuant to a uniform policy.

6.      Travelers operates a centralized adjustment operation in which its adjusters work on claims for multiple different entities, including both Travelers Home and Standard, using the same policies and procedures challenged in this case for adjusting insurance claims.

7.      The events giving rise to the individual claims asserted by Butler that are the subject of this action occurred in the Columbia Division of the District of South Carolina.

8.      On information and belief, this Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

9.      This Court has personal jurisdiction over Travelers because it has availed itself of the privilege of conducting business and issuing insurance contracts covering structures in the State of South Carolina.

**FACTS**

**A.  The Butler Property Insurance Policy And Casualty Loss**

2

10.    At all times relevant hereto, Butler was insured pursuant to an insurance contract whereby Travelers Home agreed to insure, *inter alia,* the Butler Home against property damage, bearing Policy No. 0M44019899507286331 (the "Butler Policy").  As relevant hereto, the term of the Butler Policy was February 7, 2016 through February 7, 2017.

11.    The Butler Policy provided insurance coverage for, *inter alia*, direct physical loss to the dwelling and other structures located on the insured premises, except as specifically excluded or limited by the Butler Policy.

12.    This lawsuit only concerns property insurance coverage for structural damage (*e.g*., homes, buildings and other structures) and *not* for personal property (*e.g*., clothes and furniture).

13.    Pursuant to the Butler Policy, Butler paid Travelers Home an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

14.    On or about October 6, 2016, the Butler dwelling suffered a fire loss (the "Loss").

15.    The Butler Policy was in effect at the time of the Loss, and the Loss is compensable under the terms of the Butler Policy.  As it relates to the Butler Loss, there is no applicable exclusion.

16.    Butler promptly notified Travelers Home of the Loss and made a claim against the Butler Policy.

17.    After its inspection, Travelers Home determined that the Loss was covered by the terms of the Butler Policy.

### B.  Travelers's Methodology For Calculating Actual Cash Value

18.    For the Butler dwelling, Travelers Home calculated its actual cash value ("ACV") payment obligation to Butler by first estimating the cost to repair or replace the damage with new

3

materials (replacement cost value, or "RCV"), then subtracting depreciation. This method is consistent with South Carolina Department of Insurance Bulletin Number 2014-08, issued July 26, 2014, which requires calculation of ACV by first determining RCV, then deducting depreciation.

19.    In adjusting Butler's claim, Travelers Home affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Plaintiff.

20.    Travelers Home did not calculate any portion of Butler's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of her property, or the market value of any portion of her property. Travelers Home did not conduct an appraisal of the fair market value of Butler's property.

21.    Plaintiff agrees that the methodology chosen by Travelers Home to calculate ACV, "replacement cost less depreciation," is the appropriate methodology to use.

22.    Travelers Home has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by Travelers Home, specifically including any market value methodology.

23.    Travelers Home used commercially-available computer software, described below, to make its RCV, depreciation, and ACV calculations.

24.    Travelers Home calculated the RCV of Butler's damaged property at $111,442.76.

25.    Travelers Home then calculated the depreciation for Butler's damaged property at $59,763.41 and, after subtracting the $1,500.00 deductible, issued Butler an ACV payment in the amount of $50,179.35.

26.     Travelers Home provided its computer-generated estimate for its calculation of Butler's RCV, depreciation, and ACV to Butler with its ACV payment, and that estimate is attached hereto as **Exhibit A**.

27.     Butler does not dispute Travelers Home's valuations of the amount of labor and materials necessary for the repair of her property to its pre-loss condition. Butler does not dispute any of Travelers Home's valuations as to the depreciated values of the tangible property at the time of the loss.

28.     Butler only disputes whether portions of the agreed-to and undisputed amounts of labor, as determined by Travelers Home itself, may be withheld by Travelers Home as "depreciation" from her ACV payment under the terms and conditions of her insurance policy.

29.     Butler was underpaid, and deprived of the use of her money from the time she should have received it until the date she recovers the wrongfully amounts, as more fully described below.

**C. The Advent Of: (1) The Insurance Industry's Withholding Labor As Depreciation From ACV Payments Under Computerized Claim Estimating Software Programs; And (2) The Creation Of "Labor Depreciation" Restricted Insurance Policy Coverage Forms**

30.     Traditionally, and prior to the advent of the computerized property insurance claims estimating software programs described below, property insurance adjusters adjusting structural damage claims were taught only to depreciate materials, and not to withhold labor as "depreciation," when calculating ACV. *See, e.g.*, Don Wood *et al.*, *Insurance Recovery After Hurricane Sandy: Correcting the Improper Depreciation of Intangibles Under Property Insurance Policies*, 42 TORTS, INS. & COMPENSATION L.J. 19, 24 (Winter 2013) ("I was taught many years ago that depreciation, when it was applied, must be done on a line-by-line, item-by-item basis…. I obtained charts of the average lifespans of materials. A few sample pages from the

National Association of Home Builders is attached.  Material lifespans shown in the attachment were derived from reports of product manufacturers.  Nowhere in any of the lists of materials is any labor item mentioned …"); Chip Merlin, *Few Judges and Insurance Regulators Worked In Property Claims: Understanding New Insurance Rulings*, PROP. INS. COV. LAW BLOG (August 16, 2017) ("when I was starting out, an older and experienced GAB [General Adjustment Bureau] adjuster told me they never depreciated labor").

31.    The traditional industry practice to only depreciate materials and not labor when determining the ACV of a structural property loss was recognized by the South Carolina Supreme Court several decades ago.  *See South Carolina Electric & Gas Co. v. Aetna Ins. Co.*, 120 S.E.2d 111, 118 (S.C. 1961) ("There was testimony to the effect that the actual cost of the new coils, in place, was $132,181, of which $90,300, representing the cost of materials, would be depreciable, and the balance, $41,881, representing the cost of winding and installation, would not be depreciable.").

32.    In contrast to the traditional property insurance industry approach, and in the past ten to fifteen years, commercially available claims estimating software programs began to provide a property insurer with the option to withhold a portion of the labor needed to repair a structure as "depreciation" at the same time the program calculated the depreciation arising from the physical deterioration of building materials.  This new option was created as property insurers, and their computer programmers, realized that withholding labor as "depreciation" could dramatically lower ACV payments.

The computer programs that provide an insurance company with the option to withhold labor as depreciation include not only the software program used by Travelers—Xactimate, but also most of the prevalent claims estimating software programs used today. These claims

estimating software programs all provide for the option of withholding of labor as depreciation by simply checking or unchecking a box with a computer mouse. For example, the below screenshot from the Xactimate program shows that an insurer can choose to select or de-select "Depreciate Non-Material" and "Depreciate Removal," both of which are labor items.



**Exhibit B** includes similar screenshots from the other primary valuation software platforms: Powerclaim, Simsol, and Symbility. Like Xactimate, each allow the insurance company user the option to choose whether or not to depreciate labor costs. In fact, Powerclaim states that "Tax and Labor can be optionally depreciated. Choose the appropriate setting for defaults." *Id.*

33.    Insurance companies such as Travelers generally issue company and state-wide directives, to all of their property adjusters, to either use or not use labor depreciation settings within a given jurisdiction when adjusting property claims.

34.    The claim estimating computer software program's option to withhold or not withhold labor as depreciation results in a tremendous difference between the amount a property insurer will pay for the ACV of identical claims. Assume, for example, a hypothetical, simple property claim wherein a Columbia, South Carolina policyholder's laminate wood floor, totaling 1500 square feet, was destroyed in June, 2019. The property adjuster determines that the laminate floor had depreciated by one-third of its useful life at the time of loss.

35.    If the insurance company adjusts the claim under the traditional, "materials-only" approach using Xactimate software (and using Xactimate's June 2019 price list for Columbia,

South Carolina), the flooring would be depreciated by $1,559.25, and the company would issue an ACV payment for $7,861.50, as reflected by the Xactimate screen shot below:

**Dwelling - Raw Sewage Example**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 1a. Remove Laminate - simulated wood flooring | 1,500.00 SF | 0.83 | 0.00 | 1,245.00 | <0.00> | 1,245.00 |
| 1b. Replace Laminate - simulated wood flooring | 1,500.00 SF | 5.23 | 330.75 | 8,175.75 | <1,559.25> | 6,616.50 |
| **Totals: Dwelling - Raw Sewage Example** | | | 330.75 | 9,420.75 | 1,559.25 | 7,861.50 |

36.    However, if the same insurance company, using the identical measurements and condition conclusions, toggles on the "depreciate removal" and "depreciate non-material" option settings within Xactimate's software (which now withholds portions of the labor necessary to both remove and then reinstall replacement flooring), the flooring is now depreciated by $2,999.70, resulting in an ACV payment for only $6,421.05, as reflected by the Xactimate screen shot below:

**Dwelling - Raw Sewage Example**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 1. R&R Laminate - simulated wood flooring | 1,500.00 SF | 6.06 | 330.75 | 9,420.75 | <2,999.70> | 6,421.05 |
| **Totals: Dwelling - Raw Sewage Example** | | | 330.75 | 9,420.75 | 2,999.70 | 6,421.05 |

37.    In September 2008, with the advent of an insurer's ability to withhold labor under claims estimating computer software as reflected above, the National Association of Insurance Commissioners conducted research into the "labor depreciation" practice by surveying state regulators throughout the United States.  The NAIC published a copyrighted study of these results, a copy of which is attached hereto as **Exhibit C**.

38.    Twenty-six states, including South Carolina, did not respond to the survey.  Of the jurisdictions that did respond, there were no consistent positions.  *Id.*

39.    Further, in the 2008 survey, industry regulators from Tennessee, Texas and Washington noted that property insurers were already addressing the issue of labor depreciation within their insurance policy forms.  *Id.*

40.    As a result, by 2008, property insurers had two primary options with which to proceed concerning labor depreciation. On the one hand, property insurers could create restricted insurance policy coverage forms to expressly allow for the new practice of withholding labor as depreciation.  Property insurers who chose this option had the obvious benefit of substantially lowering ACV claim payments, but risked losing market share based upon newly introduced coverage forms which restricted the amount of coverage provided.

41.    Several property insurers operating in South Carolina chose this option. For example, in November 2015, Foremost Insurance Company filed for approval with the South Carolina Insurance Department a homeowners endorsement that included, in the definition of "actual cash value," the statement that depreciation applies to "the cost of labor."  *See* **Exhibit D**. For another example, in March 2016, South Carolina's largest homeowners insurer by state market share, State Farm Fire and Casualty Company, filed for approval with the South Carolina Insurance Department an endorsement for all of its personal lines property insurance policies that defined "actual cash value" and stated "labor … is subject to depreciation." *See* **Exhibit E**.

42.    On the other hand, property insurers could also reject the new practice of withholding labor as depreciation from ACV payments.  These carriers continue to pay ACV claims at the traditional, but substantially higher rate.  For example, the Nationwide Insurance Group does not withhold labor as depreciation from ACV payments.

43.    Unfortunately, certain property insurers, in an effort to obtain an advantage over their competitors and policyholders, rejected both of these approaches.  These insurers chose not to risk their market share by creating and notifying policyholders, through restricted ACV coverage forms, that they would pay less for ACV payments.  At the same time, these insurers

began withholding labor as depreciation from ACV payments—without a change of policy forms and without informing policyholders. Travelers took this approach.

44.     Travelers' conduct was unfair to both its own policyholders and competing property insurers.  Travelers' competitors: (1) continued to pay higher claims rates under policies similar to those used by Travelers; or (2) risked losing market share by creating and disclosing restricted policy forms notifying policyholders that they would begin to pay less for ACV claims.  Travelers avoided both of these adverse consequences.

45.     Instead, when calculating Plaintiff's and putative class members' ACV benefits owed under the respective policies, Travelers Home withheld the costs of labor necessary to repair or replace Plaintiff's and putative class members' properties, even though Travelers chose not to use a coverage form that permitted the practice. Travelers depreciated costs associated with non-materials, *i.e.*, labor, throughout their ACV calculations.

46.     Travelers' withholding of labor costs associated with the repair or replacement of Plaintiff's property resulted in Plaintiff and putative class members receiving payment for their losses in an amount less than they were entitled to receive under policies that never included a form authorizing the practice.

47.     Travelers' practice of withholding labor as depreciation from ACV payments, without using a restricted coverage form, is not unique to the State of South Carolina.  For example, after the Tennessee Supreme Court decision in *Lammert v. Auto-Owners (Mutual) Insurance Company*, 572 S.W.3d 170 (Tenn. 2019), which held that labor may not be depreciated when the insurance company calculates the actual cash value of a property using the replacement cost less depreciation method and without a coverage form addressing labor depreciation,  Travelers issued refunds to 1600 Tennessee policyholders from which it withheld labor from ACV payments. *See*

**Exhibit F**.  Travelers similarly issued payments to Arkansas policyholders after the Arkansas Supreme Court decision in *Adams v. Cameron Mutual Ins. Co*., 430 S.W.3d 675 (Ark. 2013).  *See* **Exhibit G**.

### D.  The Length Of The Putative Class Period

48.    The maximum length of the putative class period is dependent upon, *inter alia*, the accrual of the causes of action for breach of contract, including but not limited to inherent discoverability of the breach.

49.    Travelers' practice of withholding labor as depreciation from Plaintiff and putative class members could not have been discovered by a reasonable person of common knowledge and experience exercising reasonable diligence.

50.    At all times relevant hereto, Travelers' insurance policies neither addressed nor called for removal or repair labor to be withheld as depreciation.

51.    Similarly, Travelers' marketing materials did not address this practice, and consumers were not told of this practice when purchasing Travelers' property insurance products.

52.    Similarly, Travelers' website neither mentions nor addresses the depreciation of labor.   Further, when the concept of depreciation is addressed, *e.g*., Travelers' website section entitled "Understanding Depreciation," Travelers leads a policyholder into believing only tangible materials like "laptops" and "structural components of your dwelling or building" are subject to depreciation.

53.    Further, in the Xactimate print-outs provided to policyholders, Travelers obfuscates and hides its practice of withholding labor from ACV from policyholders.

54.     Unlike some other insurers, Travelers does not disclose on the Xactimate print-out provided to policyholders the depreciation option settings it uses to calculate ACV.  Xactimate allows this disclosure to be made to policyholders.

55.     Further, Xactimate uses "line item" pricing to determine repair costs.  Most line items combine both labor and materials in the line item, such that it is impossible to tell if labor is being depreciated with materials.  For example, a line item for painting includes both the labor (painting) and materials (primer and paint).

56.     Some line items, however, are just for labor, such as labor minimums. The withholding of labor as depreciation becomes obvious to a sophisticated policyholder if Travelers depreciates "pure labor line items" that would obviously reflect the withholding of labor.  For example, line items 592 through 595 of Travelers' estimate of Plaintiff's loss reflects labor minimums for carpenters (stairway), plumbers (shower doors and toilets), and tile workers (tile / marble).  No depreciation is applied to this labor, leading one to believe labor is not being withheld as depreciation.  *See* **Exhibit A** at 43**.**

57.     Similarly, other pure labor line items such as removing items (*e.g*, Line Item 120) and preparatory cleaning (*e.g*., Line Items 1, 3, 12, 13) are not depreciated.  *Id*. at 3-4, 12.  Again, this leads a policyholder to believing that Travelers was not depreciating labor.

58.     In other words, Travelers only withheld labor from line items in estimates in a manner that avoided detection.  Travelers did not make a principled decision to depreciate all labor for Plaintiff's claim, but rather Travelers only depreciated labor in line items where it would be difficult if not impossible to detect the practice.

59.     At all times relevant hereto, Travelers was under an affirmative duty to fairly disclose the manner in which it calculated ACV payments to policyholders. In addition, when

providing estimates to Plaintiff and similarly situated policyholders, Travelers was under a duty to be truthful, and to not deceive by omission.

60.     Travelers was in a superior position over policyholders to know that they were depreciating labor through Xactimate. Travelers' policyholders are not sophisticated in insurance claims handling procedures like Travelers.  In addition, Travelers controlled the settings for the software, which expressly permit a company to properly limit depreciation to materials only. Moreover, policyholders do not have access to Travelers' software to determine whether it was used to depreciate labor costs.  Without such access, and due to Travelers' affirmative steps taken to conceal its depreciation of labor costs, Travelers' policyholders lacked the same access to information enjoyed by Travelers and could not determine that Travelers was depreciating labor costs.

61.     The practice therefore is not disclosed in the insurance policy, in the claim estimate, nor in the marketing materials.  The affirmative steps Travelers took to conceal the cause of action for breach of the insurance contract were material facts that a reasonable person would have considered important in deciding whether to purchase insurance and/or accept ACV payments from Travelers.

62.     Travelers' depreciation of labor costs was inherently undiscoverable by its very nature by its policyholders and thus Travelers' policyholders would not be—and in fact were not—aware that Travelers depreciated labor costs when calculating ACV despite policyholders' due diligence.  Travelers is solely at fault for its policyholders' lack of knowledge about Travelers' depreciation of labor costs.

63.     The concealment of information in estimates and other statements was performed by Travelers with the intent that policyholders believed that only materials were being depreciated

when receiving ACV claim payments, and that policyholders would not know that their claim payments were actually diminished by the withholding of repair labor through the unfair manipulation of the Xactimate software and that policyholders would not contest the concealed practice in court or through regulatory action.

## AMOUNT IN CONTROVERSY

64.     Upon information and belief, the amount in controversy with respect to the proposed class exceeds $5,000,000, exclusive of interest and costs.

## CLASS ACTION ALLEGATIONS

65.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this lawsuit as a class action on behalf of herself and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.   Only to the extent it is a requirement under applicable law, the class is ascertainable.

66.     The proposed class that Plaintiff seeks to represent is defined as follows:

> All Travelers policyholders under any property policies issued by Travelers who made: (1) a structural damage claim for property located in the State of South Carolina; and (2) which resulted in an actual cash value payment from which "non-material depreciation" was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of "non-material depreciation" causing the loss to drop below the applicable deductible.

> In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within Xactimate software.

> The class period for the proposed class is the maximum time period as allowed by applicable law.

> The class excludes all claims arising under policy forms expressly permitting the "depreciation" of "labor" within the text of the policy form and any claims in which the initial actual cash value payment

exhausted the applicable limits of insurance. The class also excludes all claims wherein the initial actual cash value payment exhausted the applicable policy limits.

67.     Plaintiff reserves the right to amend the definition of the proposed class. The following persons are expressly excluded from the Class: (1) Travelers and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; and (3) the Court to which this case is assigned and its staff.

68.     Plaintiff and members of the putative class as defined all have Article III standing as all such persons and entities, at least initially, received lower claim payments than permitted under the policy. Certain amounts initially withheld as depreciated labor may be later repaid to policyholders under the RCV provisions of their policies. However, policyholders who have been subsequently repaid in whole or in part for initially withheld labor depreciation still have incurred damages, at the least, in the form of the lost "time value" of money during the period of withholding, *i.e.*, interest on the amounts improperly withheld, for the time period of withholding.

69.     Specifically, under South Carolina law, Plaintiff and members of the putative class who have been wrongfully deprived of money by the withholding of labor from ACV payments have been damaged in two ways. First, they have been damaged because they have not received the money to which they are entitled. Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until it was or is paid in full. Under South Carolina law, prejudgment interest compensates the wronged party for the loss of the use of the money he, she or it should have received earlier but for the breach of contract.

70.     The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believe that hundreds or thousands of people geographically dispersed across South Carolina have been damaged by Travelers' actions. The names and

addresses of the members of the proposed class are readily identifiable through records maintained by Travelers or from information readily available to Travelers.

71.    The relatively small amounts of damage suffered by most members of the proposed class make filing separate lawsuits by individual members economically impracticable.

72.    Travelers has acted on grounds generally applicable to the proposed class in that Travelers has routinely depreciated labor costs in its adjustment of property damage claims under its policies of insurance.  It is reasonable to expect that Travelers will continue to withhold labor as depreciation to reduce the amount they pay to its insureds under these policies absent this lawsuit.

73.    Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

    a.    Whether Travelers' policy language allows them to withhold labor as depreciation in its calculation of ACV payments;

    b.    Whether Travelers' policy language is ambiguous concerning the practice of withholding labor as depreciation when calculating ACV payments, and, if so, how Travelers' insurance policies should be interpreted;

    c.    Whether Travelers' withholding of labor as depreciation in its calculation of ACV payments breaches the insurance policies;

    d.    Whether Travelers has a custom and practice of withholding labor as depreciation in its calculation of ACV payments;

    e.    Whether Plaintiff and members of the proposed class have been damaged as a result of Travelers' withholding of labor as depreciation in its calculation of ACV payments;

    f.    Whether Plaintiff and members of the proposed class are entitled to a declaration, as well as potential supplemental relief, under the Declaratory Judgment Act; and

g.  Whether Plaintiff and members of the proposed class are entitled to equitable relief in the form of specific performance, unjust enrichment, declaratory relief or restitutionary damages.

74.    Plaintiff's claims are typical of the claims of all proposed class members, as they are all similarly affected by Travelers' custom and practice concerning withholding labor as depreciation. Further, Plaintiff's claims are typical of the claims of all proposed class members because her claims arise from the same practices and course of conduct that give rise to the claims of the proposed class members and are based on the same factual and legal theories.  Plaintiff is not different in any material respect from any other member of the proposed class.

75.    Plaintiff and her counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiff's interests do not conflict with the interests of the proposed class she seeks to represent. Plaintiff has retained lawyers who are competent and experienced in class action and insurance litigation.  Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the proposed class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the proposed class while recognizing the risks associated with litigation.

76.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed class members in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such

cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

77.     In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of Plaintiff and members of the proposed class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

78.     Questions of law or fact common to Plaintiff and the proposed class members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed class members to seek and obtain relief.  On the other hand, a class action will serve important public interests by permitting consumers harmed by Travelers' unlawful practices to effectively pursue recovery of the sums owed to them, and by deterring further unlawful conduct.  The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

79.     Class certification is further warranted because Travelers has acted or refused to act on grounds that apply generally to the class, so final injunctive relief or corresponding declaratory

relief is appropriate respecting the class as a whole. Plaintiff may seek, in the alternative, certification of an issues class under Fed. R. Civ. P. 23(c)(4).

## COUNT I
## BREACH OF CONTRACT

80.    Plaintiff restates and incorporate by reference all preceding allegations.

81.    Travelers entered into policies of insurance with Plaintiff and members of the proposed class. These insurance policies govern the relationship between Travelers, Plaintiff and members of the proposed class, as well as the manner in which claims for covered losses are handled.

82.    The policies of insurance between Travelers and Plaintiff and the other proposed class members are binding contracts under South Carolina law, supported by valid consideration in the form of premium payments in exchange for insurance coverage.

83.    Travelers drafted the insurance policies at issue, which are essentially identical in all respects material to this litigation.

84.    In order to receive ACV claim payments, Plaintiff and proposed class members complied with all material provisions and performed all of their respective duties with regard to their insurance policies.

85.    The policies of insurance Travelers issued to Plaintiff and members of the proposed class state that, in the event of a loss, Travelers may fulfill its full or initial contractual obligation to an insured party by paying the ACV of the loss. At all times relevant hereto, Travelers' custom and practice has been, and is, to make such payments based upon Travelers' calculation of the ACV for the loss, less any applicable deductible.

86.    Travelers breached its contractual duty to pay Plaintiff and members of the proposed class the ACV of their claims by unlawfully withholding labor as depreciation.

87.    Travelers' actions in breaching its contractual obligations to Plaintiff and members of the proposed class benefitted and continue to benefit Travelers. Likewise, Travelers' actions damaged and continue to damage Plaintiff and members of the proposed class.

88.    Travelers' actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiff and members of the proposed class.

89.    In light of the foregoing, Plaintiff and members of the proposed class are entitled to recover damages sufficient to make them whole for all amounts Travelers unlawfully withheld or delayed from its ACV payments as labor cost depreciation, including unrecovered depreciated labor costs and interest on any withheld or delayed labor cost depreciation withholdings.

90.    Plaintiff and members of the proposed class seek any and all relief as may be permitted under South Carolina law to remedy the ongoing breaches of contract.

## COUNT II
## DECLARATORY JUDGMENT AND RELIEF

91.    Plaintiff restates and incorporates by reference all preceding allegations.

92.    This Court is empowered by the Declaratory Judgment Act as codified at 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to declare the rights and legal relations of parties regardless of whether or not further relief is or could be claimed.

93.    A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

94.    Plaintiff and members of the proposed class have complied with all relevant conditions precedent in its contracts.

95.    Plaintiff seeks, personally and on behalf of the proposed class, a declaration that Travelers' property insurance contracts prohibit the withholding of labor costs as depreciation when adjusting partial losses under the methodology employed here.

96.    Plaintiff further seeks, personally and on behalf of the proposed class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion by Travelers in engaging in the conduct described herein, as may be permitted by law.

97.    Plaintiff and members of the proposed class have suffered injuries.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.    Enter an order certifying this action as a class action, appointing Plaintiff Miriam Butler as the representative of the class, and appointing Plaintiff's attorneys as counsel for the class;

2.    Enter a declaratory judgment, declaring that Travelers' practice of withholding labor costs as depreciation is contrary to and breaches the insurance policies issued to Plaintiff and members of the class;

3.    Enter a preliminary and permanent injunction and equitable relief against Travelers and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the policies, practices, customs, and usages complained of herein;

4.      Enter an order that Travelers specifically perform and carry out policies, practices, and programs that remediate and eradicate the effects of its past and present practices complained of herein;

5.       Award compensatory damages for all sums depreciated as labor costs under the policy, plus prejudgment interest on all such sums, to Plaintiff and members of the proposed class;

6.      Award costs, expenses, and disbursements incurred herein by Plaintiff and members of the class;

7.      Pre- and Post-Judgment interest; and

8.      Grant such further and additional relief as the Court deems necessary and proper.

_/s/ Summer C. Tompkins_____
DAVID E. MASSEY (SC Bar 3679)
SUMMER C. TOMPKINS (SC Bar 76078)
LAW OFFICES OF DAVID E. MASSEY
  TRIAL LAWYERS
1620 Gervais Street, Suite A
Post Office Box 7014
Columbia, SC 29202
(803)256-4824
radmassey@aol.com
summertompkins2010@gmail.com

ERIK D. PETERSON (KY Bar 93003)
MEHR, FAIRBANKS & PETERSON
  TRIAL LAWYERS, PLLC
(to be admitted *pro hac vice*)
201 West Short Street, Suite 800
Lexington, KY 40507
(859) 225-3731
edp@austinmehr.com

J. BRANDON McWHERTER (TN Bar 21600)
GILBERT McWHERTER
 SCOTT BOBBITT PLC
(to be admitted *pro hac vice*)
341 Cool Springs Blvd, Suite 230
Franklin, TN  37067
(615) 354-1144
bmcwherter@gilbertfirm.com

T. JOSEPH SNODGRASS (MN Bar 231071)
LARSON KING, LLP
(to be admitted *pro hac vice*)
30 7th Street E., Suite 800
St. Paul, MN 55101
T: 651-312.6510
jsnodgrass@larsonking.com

***Attorneys for Plaintiff and
Proposed Class Representative***