# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | | |
|---|---|---|
| Miriam Butler and Evelyn Stewart, | ) | Civil Action No.: 3:19-cv-02621-JMC |
| in her capacity as Personal Representative | ) | |
| of the Estate of Joseph Stewart, individually | ) | |
| and on behalf of others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| The Travelers Home and Marine Insurance | ) | |
| Company and The Standard Fire Insurance | ) | |
| Company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

William P. Davis
Federal ID No.: 454
Baker, Ravenel & Bender, LLP
P.O. Box 8057 (29202)
3710 Landmark Drive, Suite 400
Columbia, South Carolina 29204
(803) 799-9091
(803) 779-3423 (facsimile)
E-mail: wdavis@brblegal.com

Stephen E. Goldman
        (pro hac vice motion forthcoming)
Wystan M. Ackerman
        (pro hac vice motion forthcoming)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
(860) 275-8200
(860) 275-8299 (facsimile)
E-mail: sgoldman@rc.com
E-mail: wackerman@rc.com

# TABLE OF CONTENTS

**Page**

SUMMARY OF NATURE OF THE CASE ............................................................. 1

STATEMENT OF FACTS ALLEGED ................................................................... 3

    A.  The Butler Loss ................................................................................. 3

    B.  The Stewart Loss .............................................................................. 4

    C.  Plaintiffs' Alleged Causes of Action .............................................. 6

ARGUMENT ....................................................................................................... 7

I.  APPLICABLE LEGAL STANDARDS ......................................................... 7

    A.  Rule 12(b)(6) Motion to Dismiss Standard ..................................... 7

    B.  South Carolina Principles of Insurance Policy Construction ........... 7

II.  AN ORDINARY PERSON WOULD UNDERSTAND THAT "ACTUAL CASH VALUE" MEANS ACTUAL ECONOMIC VALUE ............................ 9

III.  PLAINTIFFS' PROPOSED INTERPRETATION OF "ACTUAL CASH VALUE" IS CONTRARY TO THE HISTORY AND PURPOSE OF ACV INSURANCE ................... 12

    A.  Background on the History and Purpose of ACV Insurance ........... 12

    B.  Court Decisions and Insurance Adjustment Manuals Have Long Recognized That Depreciation is Properly Applied to the Full Cost of Repair or Replacement ................ 15

IV.  THE STRONG WEIGHT OF WELL-REASONED APPELLATE AUTHORITY ON POINT SUPPORTS DEFENDANTS' POSITION ............................ 17

    A.  Five Appellate Decisions Support Defendants' Position ................. 17

    B.  The South Carolina Supreme Court Is Likely to Follow the Majority Rule ................... 22

    C.  South Carolina Is Unlikely to Follow the Minority Decisions ....................... 24

V.  IN OTHER RELEVANT CONTEXTS, DEPRECIATION IS APPLIED TO THE FULL VALUE OF A BUILDING, INCLUDING BOTH LABOR AND MATERIALS ................ 28

    A.  Property Tax Assessments .............................................................. 29

    B.  Eminent Domain and Other Real Estate Valuations ....................... 30

VI.  BOTH THE BREACH OF CONTRACT CLAIM AND DECLARATORY JUDGMENT CLAIM SHOULD BE DISMISSED .................... 32

CONCLUSION ................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accardi v. Hartford Underwriters Ins. Co.*,
   No. 18 CVS 2162, 2018 WL 5273971 (N.C. Super. Oct. 22, 2018) ......................................27

*Adams v. Cameron Mut. Ins. Co.*, 430 S.W.3d 675 (Ark. 2013) ..................................................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................................7

*B.L.G. Enterprises, Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327 (S.C. 1999)...................................8

*Baiden & Assocs., Inc. v. Crum & Forster Specialty Ins. Co.*,
   No. 4:11-CV-00267-RBH, 2012 WL 591752 (D.S.C. Feb. 23, 2012) .....................................7

*Bardsley v. Gov't Employees Ins. Co.*, 747 S.E.2d 436 (S.C. 2013) ..........................................8, 9

*Basham v. United Servs. Auto. Ass'n*,
   No. 16-CV-03057-RBJ, 2017 WL 3217768 (D. Colo. July 28, 2017) ...................................28

*Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co.*,
   709 S.E.2d 85 (S.C. Ct. App. 2011)...............................................................................8, 9, 23

*Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399 (S.C. 2014) .................................................26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................7

*Boise Ass'n of Credit Men v. United States Fire Ins. Co.*, 256 P. 523 (Idaho 1927)....................15

*Bowman v. Standard Fire Ins. Co.*, 397 F. App'x 886 (4th Cir. 2010)...........................................8

*Columbia College v. Pennsylvania Ins. Co.*, 157 S.E.2d 416 (S.C. 1967) ..................................13

*Commercial Fire Ins. Co. v. Allen*, 1 So. 202 (Ala. 1886) ..........................................................15

*Cranfield v. State Farm Fire & Cas. Co.*,
   340 F. Supp. 3d 670 (N.D. Ohio 2018)............................................................................28, 33

*D & S Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1 (Neb. 2012) ........................................14, 24

*Daggs v. Orient Ins. Co. of Hartford*,
   38 S.W. 85 (Mo. 1896), *aff'd*, 172 U.S. 557 (1899) ..............................................................14

*Erin Rancho Motels, Inc. v. United States Fid. & Guar. Co.*,
   352 N.W.2d 561 (Neb. 1984)..................................................................................................10

*Ex parte United Servs. Auto. Ass'n*, 614 S.E.2d 652 (S.C. Ct. App. 2005) .................................8, 9

*Graves v. American Family Mut. Ins. Co.*,
    686 Fed. Appx. 536 (10th Cir. 2017)...........................................2, 15, 18, 19, 23, 26

*Hanback v. DRHI, Inc.*, 647 F. App'x 207 (4th Cir. 2016) ..........................................33

*Harrell v. Minn. Mut. Life Ins. Co.*, 937 S.W.2d 809 (Tenn. 1996) ...............................25

*Henn v. American Family Mut. Ins. Co.*,
    894 N.W.2d 179 (Neb. 2017)......................................2, 10, 20, 21, 22, 26

*Hicks v. State Farm Fire & Cas. Co.*, 751 Fed. App'x 703 (6th Cir. 2018).......................2, 26, 27

*Higgins v. Insurance Co. of N. Am.*, 469 P.2d 766 (Or. 1970) .....................................14

*Hous. Auth. of City of Charleston v. Olasov*, 320 S.E.2d 478 (S.C. Ct. App. 1984)....................31

*Hull v. Spartanburg Cty. Assessor*, 641 S.E.2d 909 (S.C. Ct. App. 2007) ...................................29

*In re Birmingham*, 846 F.3d 88 (4th Cir. 2017)..............................................7

*In re State Farm Fire & Cas. Co. ("Labrier")*,
    872 F.3d 567 (8th Cir. 2017) .........................................2, 13, 14, 17, 18, 26

*Joseph v. Sears Roebuck & Co.*, 77 S.E.2d 583 (S.C. 1953) ..........................................14

*Knuppel v. American Ins. Co.*, 269 F.2d 163 (7th Cir. 1959) ..........................................15

*Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170 (Tenn. 2019) ...............................2, 25

*Lampe Mkt. Co. v. Alliance Ins. Co.*, 22 N.W.2d 427 (S.D. 1946)...............................................10

*McAnarney v. Newark Fire Ins. Co.*, 159 N.E. 902 (N.Y. 1928) .............................................9, 10

*McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*,
    780 F.3d 582 (4th Cir. 2015) ..................................................7

*Morris v. Auto-Owners Ins. Co.*,
    No. 3:16-CV-00880-JMC, 2016 WL 7473430 (D.S.C. Dec. 29, 2016) ...................................8

*Mutual Safety Ins. Co. v. Hone*, 2 N.Y. 235 (1849).......................................................13

*Nat'l Sec. Fire & Cas. Co. v. DeWitt*, 85 So. 3d 355 (Ala. 2011) .................................................14

*Papurello v. State Farm Fire & Cas. Co.*, 144 F. Supp. 3d 746 (W.D. Pa. 2015) .................28, 32

*Pennsylvania Nat. Mut. Cas. Ins. Co. v. Lewis*,
    105 F. Supp. 3d 573 (D.S.C. 2015), *aff'd*, 650 F. App'x 159 (4th Cir. 2016)..........................7

*Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999) ...................................................7

*Planet Earth TV, LLC v. Level 3 Commc'ns, LLC*,
    No. 1:17-CV-00090-MR-DLH, 2018 WL 3660205 (W.D.N.C. Aug. 2, 2018) ....................33

*Providence Washington Ins. Co. v. Gulinson*, 215 P. 154 (Colo. 1923)........................................15

*Real Asset Management v. Lloyd's of London*, 61 F.3d 1223 (5th Cir. 1995)..............................16

*Redcorn v. State Farm Fire & Casualty Co.*, 55 P.3d 1017 (Okla. 2002)....................2, 18, 19, 20

*S.C. Elec. & Gas Co. v. Aetna Ins. Co.*, 120 S.E.2d 111 (S.C. 1961)..........................10, 22, 23, 27

*Shelter Mut. Ins. Co. v. Goodner*, 477 S.W.3d 512 (Ark. 2015) ..................................................24

*Stickley v. Mobile Ins. Co.*, 16 S.E. 280 (S.C. 1892) .....................................................................12

*Svea Fire & Life Ins. Co. v. State Sav. & Loan Ass'n*,
    19 F.2d 134 (8th Cir. 1927) .........................................................................................................16

*Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349 (Ind. 1982) ..................................................13

*True v. Raines*, 99 S.W.3d 439 (Ky. 2003).....................................................................................26

*Tyler v. Shelter Mut. Ins. Co.*, 184 P.3d 496 (Okla. 2008) ...........................................................10

*Ulmer v. Phoenix Fire Ins. Co.*, 39 S.E. 712 (S.C. 1901) ..............................................................12

*Ware v. Metro. Prop. & Cas. Ins. Co.*, 220 F. Supp. 3d 1288 (M.D. Ala. 2016) ..........................28

*Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780 (Minn. 2016).................2, 20, 21, 24, 26

*Wisconsin Screw Co. v. Fireman's Fund Ins. Co.*, 297 F.2d 697 (7th Cir. 1962) ..........................15

**Statutes, Constitutional Provisions and Regulations**

Ark. Code Ann. § 23-88-106 ...........................................................................................................25

S.C. Code Ann. § 12-37-930............................................................................................................29

S.C. Code Ann. § 58-27-1360..........................................................................................................32

S.C. Code Ann. § 58-31-350............................................................................................................32

S.C. Code § 40-60-30 et seq. ...........................................................................................................31

S.C. Code § 40-60-35.......................................................................................................................31

S.C. Code of Regs. R. 19-410.3.......................................................................................................32

S.C. Code of Regs. R. 137-100.02 ...............................................................................31

S.C. Code of Regs. R. 137-900.05 ...............................................................................31

S.C. Const. art. X, sec. 1 .............................................................................................29

**Other Authorities**

72 Am.Jur.2d State and Local Taxation § 669 (2001) .................................................30

Actual Cash Value Calculator available at https://www.miniwebtool.com/actual-
cash-value-calculator/ (visited Oct. 28, 2019) .........................................................25

Appraisal Institute, THE APPRAISAL OF REAL ESTATE 386 (13th ed. 2008)..................31

William Arthur, APPRAISERS' AND ADJUSTERS' HANDBOOK (1924) (Ex. 4 hereto).....................16

BLACK'S LAW DICTIONARY (9th ed. 2004) ....................................................18, 19, 28

IRS Publication No. 551 (rev. May 2002) ...................................................................32

IRS Publication No. 946 (Feb. 15, 2013 version).........................................................32

Chip Merlin, "Few Judges and Insurance Regulators Worked in Property Claims:
Understanding New Depreciation Rulings," Property Insurance Coverage Law
Blog (Aug. 16, 2017) ................................................................................................17

Robert J. Prahl, CPCU, INTRODUCTION TO CLAIMS (Insurance Institute of America
1988) (Ex. 6 hereto) ................................................................................................17

Prentiss B. Reed, ADJUSTMENT OF FIRE LOSSES (1929) (Ex. 5 hereto) ........................16

South Carolina Dep't of Insurance, "Post-Disaster Claims Guide" (Ex. 3 hereto) ..........12, 22, 23

Garth E. Thimgan, CAE et al., PROPERTY ASSESSMENT VALUATION (International
Ass'n of Assessing Officers 3d ed.)...........................................................................30

Don Wood et al., "Insurance Recovery After Hurricane Sandy: Correcting the
Improper Depreciation of Intangibles Under Property Insurance Policies,"
N.Y. State Bar Ass'n Torts, Insurance & Compensation Law Section Journal,
vol. 42 no.1, at 22 (Winter 2013) ............................................................................17

## SUMMARY OF NATURE OF THE CASE

This case is one of numerous putative class action lawsuits filed across the country involving the application of depreciation in estimating "actual cash value" under homeowners and commercial property insurance policies.[1] Since the 19th century, insurance policies have provided for payment of the "actual cash value" (ACV) of covered damage to structures. Today, most policies provide coverage on an ACV basis unless and until the insured repairs or replaces the damaged property. After repair or replacement is completed, a supplemental payment is made so that the total amount paid is the full cost of repair or replacement of covered damage (subject to the deductible and any other applicable provisions of the policy). If, however, the insured declines to make the repairs or fails to demonstrate that he or she spent more than the ACV in making repairs, the policy provides coverage only on an ACV basis.

For decades, courts across the country, including the South Carolina Supreme Court, have interpreted "actual cash value" in accordance with its ordinary, common sense meaning, i.e., the actual value in cash or, in other words, the actual economic value of the damaged property. One of the well-established methods used for estimating the ACV/actual economic value of damaged property is the cost approach, which involves estimating the replacement cost of the damage and then subtracting depreciation. This approach to property valuation is used not only for insurance purposes, but also for property tax assessments, real estate appraisals and other purposes. When this approach is used to estimate ACV, depreciation is applied to the full cost of repair or replacement, not merely a portion of that cost. This replacement-cost-less-depreciation approach to estimating ACV was used by Defendants in adjusting Plaintiffs' insurance claims in this case.

---

[1] To Defendants' knowledge, this is the first such case filed in any South Carolina federal or state court.

In recent years, plaintiffs' attorneys across the country have attempted to create a legal fiction, under which the ACV of damaged property would *not* be the actual value in cash of the property. These plaintiffs' attorneys contend that, where an insurance policy provides for payment of ACV, the policyholder is entitled, as a matter of law, to be paid an amount calculated by estimating the replacement cost of the damage and subtracting only the *portion* of the depreciation attributable to the cost of materials. The argument made is that only the cost of building materials depreciates, not the labor to install them. But this proposed interpretation of ACV makes no economic sense, is contrary to the plain and ordinary meaning of the words "actual cash value," and contrary to court decisions and insurance industry practices stretching back many decades. There is no support for the proposition that Plaintiffs' approach is an *accurate* method of valuing a structure, or any portion thereof. It is the full value of property that depreciates over time, not merely the portion of the property's value that might be attributable to the materials that went into building the structure. It is the value of the roof of a structure that depreciates, for example, not the shingles and nails.

For these reasons and others, Plaintiffs' breach of contract and declaratory judgment claims are premised on a legal theory that has been squarely rejected as a matter of law by the majority of courts to address this issue, including state supreme courts in Nebraska, Oklahoma and Minnesota, and federal courts of appeals applying Kansas and Missouri law.[2] This Court should predict that South Carolina would follow this majority rule, and dismiss the First Amended Complaint as a matter of law.

---

[2] *Henn v. American Family Mut. Ins. Co.*, 894 N.W.2d 179 (Neb. 2017); *In re State Farm Fire & Cas. Co.*, 872 F.3d 567 (8th Cir. 2017) (Missouri law); *Graves v. American Family Mut. Ins. Co.*, 686 Fed. Appx. 536 (10th Cir. 2017) (Kansas law); *Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780 (Minn. 2016); *Redcorn v. State Farm Fire & Casualty Co.*, 55 P.3d 1017, 1019 (Okla. 2002); *but see Hicks v. State Farm Fire & Cas. Co.*, 751 Fed. App'x 703 (6th Cir. 2018) (unpublished 2-1 decision predicting that Kentucky would not follow the majority rule); *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170 (Tenn. 2019) (declining to follow majority rule).

## STATEMENT OF FACTS ALLEGED

### A.     The Butler Loss

Plaintiff Miriam Butler alleges that she owns residential property in Columbia, South Carolina (the "Butler Property") that was damaged by fire on October 6, 2016 (the "Butler Loss"). (First Am. Compl. ¶¶ 1, 15.) At the time of the Butler Loss, the Butler Property was insured by a homeowners' insurance policy (the "Butler Policy") issued by The Travelers Home and Marine Insurance Company ("Travelers"). (*Id.*, ¶ 11.) Butler submitted a claim to Travelers under the Butler Policy. (*Id.*, ¶ 17.) The Butler Policy provides, in pertinent part, as follows with respect to how covered property losses are settled:

> **3. Loss Settlement.** . . . Covered property losses are settled as follows:
>
> . . .
>
> **b.** Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
>
> **(1)** If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
> **(a)** The limit of liability under this policy that applies to the building;
>
> **(b)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
>
> **(c)** The necessary amount actually spent to repair or replace the damaged building.
>
> . . .
>
> **(4)** <u>We will pay no more than the actual cash value of the damage until actual repair or replacement is complete</u>. Once actual repair or replacement is complete, we will settle the loss as noted in **b.(1)** and **b.(2)** above.
>
> However, if the cost to repair or replace the damage is less than $2,500, we will settle the loss as noted in **b.(1)** and **b.(2)** above whether or not actual repair or replacement is complete.
>
> **(5)** <u>You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis</u>. You may then make claim for any additional liability according to the provisions of this Condition **3.** Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

(Butler Policy, Form HO-3 (10-06), at 15-16 (Ex. 1 hereto) (emphasis added).) As quoted above, the Butler Policy provides for payment of the ACV of the damage unless and until repair or replacement of the damaged property is complete.

Butler alleges that Travelers estimated that the replacement cost of the damage to her home was $111,442.76, and deducted depreciation of $59,763.41. After subtracting the deductible of $1,500, Travelers issued an ACV payment in the amount of $50,179.35. (First Am. Compl., ¶ 34.) Butler does not allege that she has completed the repair or replacement of the Butler Property.[3] She alleges that she is entitled to be paid the ACV of the damage to her property. (*Id.*, ¶¶ 106-107.)

**B.    The Stewart Loss**

Plaintiff Evelyn Stewart alleges that she is the personal representative of the estate of her deceased father, Joseph Stewart, who owned residential property in Columbia, South Carolina (the "Stewart Property") that was damaged by fire on September 17, 2016 (the "Stewart Loss"). (First Am. Compl. ¶¶ 2, 23.) At the time of the Stewart Loss, the Stewart Property was insured by a homeowners' insurance policy (the "Stewart Policy") issued by The Standard Fire Insurance Company ("Standard Fire"). (*Id.*, ¶ 19.) Joseph Stewart submitted a claim to Standard Fire under the Stewart Policy. (*Id.*, ¶ 25.) The Stewart Policy provides, in pertinent part, as follows with respect to how covered property losses are settled:

> **3.    Loss Settlement.** Covered property losses are settled as follows:
> . . .
> **c.**    BUILDINGS UNDER COVERAGE A OR B AT REPLACEMENT COST WITHOUT DEDUCTION FOR DEPRECIATION, SUBJECT TO THE FOLLOWING:
> **(1)**    IF AT THE TIME OF LOSS THE AMOUNT OF INSURANCE IN THIS POLICY ON THE DAMAGED BUILDING IS 80% OR MORE OF THE FULL REPLACEMENT COST OF THE BUILDING IMMEDIATELY PRIOR TO THE LOSS, WE WILL PAY THE COST

---

[3] In fact, although this is not alleged in the complaint and thus is beyond the scope of this motion, Butler has completed a portion of the repairs to the Butler Property, and Travelers has paid for that portion of the repairs on a replacement cost basis by paying some of the amounts previously withheld as depreciation.

4

OF REPAIR OR REPLACEMENT, WITHOUT DEDUCTION FOR DEPRECIATION, BUT NOT EXCEEDING THE SMALLEST OF THE FOLLOWING AMOUNTS:

**(a)** THE LIMIT OF LIABILITY UNDER THIS POLICY APPLYING TO THE BUILDING;

**(b)** THE REPLACEMENT COST OF THAT PART OF THE BUILDING DAMAGED FOR EQUIVALENT CONSTRUCTION AND USE ON THE SAME PREMISES; OR

**(c)** THE AMOUNT ACTUALLY AND NECESSARILY SPENT TO REPAIR OR REPLACE THE DAMAGED BUILDING.

. . .

**(4)** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair is complete, we will settle the loss according to the provisions of **c.(1)** and **c.(2)** above.

However, if the cost to repair or replace is less than $2,500 we will settle the loss according to the provisions of **c.(1)** and **c.(2)** above, whether or not actual repair or replacement is complete.

**(5)** YOU MAY DISREGARD THE REPLACEMENT COST LOSS SETTLEMENT PROVISIONS AND MAKE CLAIM UNDER THIS POLICY FOR LOSS OR DAMAGE TO BUILDINGS ON AN ACTUAL CASH VALUE BASIS AND THEN MAKE CLAIM WITHIN 180 DAYS AFTER LOSS FOR ANY ADDITIONAL LIABILITY ON A REPLACEMENT COST BASIS.

(Stewart Policy, Form HO-3 (06-91), at 12-13, as modified by Form HA-300 SC (10-12) (Ex. 2 hereto) (emphasis added).) As quoted above, the Stewart Policy provides for payment of the ACV of the damage unless and until repair or replacement of the damaged property is complete.

Stewart alleges that Standard Fire estimated that the replacement cost of the damage to the Stewart Property was $2,617.26, and deducted depreciation of $1,017.79. After subtracting the deductible of $1,000, Standard Fire issued an actual cash value payment in the amount of $599.47. (First Am. Compl., ¶ 46.) Stewart does not allege that she has completed the repair or replacement of the Stewart Property. She alleges that she is entitled to be paid the ACV of the damage to her property. (*Id.*, ¶¶ 106-107.)

5

### C.    Plaintiffs' Alleged Causes of Action

Butler and Stewart allege that Travelers and Standard Fire, respectively, paid them less than they were entitled to be paid under their policies (the "Policies") for ACV, as a matter of law. Specifically, Plaintiffs maintain that Defendants, in estimating the ACV of Plaintiffs' losses, improperly calculated the depreciation deductions based on both the material cost and labor cost components of the estimated replacement cost of the damage. Plaintiffs claim that Defendants, in estimating the depreciation, should have applied depreciation only to the estimated cost of materials, and not to the estimated cost of labor. (*Id.*, ¶¶ 37, 49, 107, 110.) Plaintiffs contend that there should be a rule of law that in *all* circumstances, Defendants' "property insurance contracts prohibit the withholding of [a portion of] labor costs as depreciation . . . ." (*Id.*, ¶ 116.)

The First Amended Complaint alleges claims for breach of contract and declaratory relief. The breach of contract claim (Count I) alleges that "Travelers[4] breached its contractual duty to pay Plaintiffs and members of the proposed class the ACV of their claims by unlawfully withholding labor as depreciation." (*Id.*, ¶ 107.) Plaintiffs seek "damages sufficient to make them whole for all amounts Travelers unlawfully withheld or delayed from its ACV payments as labor cost depreciation, including unrecovered depreciated labor costs and interest on any withheld or delayed labor cost depreciation withholdings." (*Id.*, ¶ 110.) The declaratory judgment claim (Count II) seeks "a declaration that Travelers' property insurance contracts prohibit the withholding of labor costs as depreciation when adjusting partial losses under the methodology employed here." (*Id.*, ¶ 116.) Plaintiffs also purport to seek equitable relief that amounts to ordering that supplemental payments be issued to Plaintiffs and the proposed class. (*Id.*, ¶ 117.)

---

4 In the First Amended Complaint, the term "Travelers" is defined to include both defendants. (First Am. Compl., ¶ 5.)

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

#### A.    Rule 12(b)(6) Motion to Dismiss Standard

To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A plaintiff "must plead more than labels and conclusions," and "[f]actual allegations must be enough to raise the right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555; *see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.,* 780 F.3d 582, 587 (4th Cir. 2015) (explaining the standard for a motion to dismiss under *Iqbal* and *Twombly*). A motion to dismiss is also properly granted where, assuming the facts alleged are true, the moving party is entitled to judgment as a matter of law. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 97 (4th Cir. 2017). Insurance policies referred to in the complaint and central to the plaintiffs' claims are properly considered on a Rule 12 motion without converting it to a summary judgment motion. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (court may consider document outside complaint in deciding motion to dismiss where document is "integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity"); *Baiden & Assocs., Inc. v. Crum & Forster Specialty Ins. Co.*, No. 4:11-CV-00267-RBH, 2012 WL 591752, at *3 (D.S.C. Feb. 23, 2012) (insurance policy relied upon in complaint was "plainly within the ambit of extraneous materials the Court may consider in ruling on a motion to dismiss").

#### B.    South Carolina Principles of Insurance Policy Construction

This Court applies South Carolina law to insurance policies delivered in South Carolina insuring properties located in South Carolina. *See, e.g.*, *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Lewis*, 105 F. Supp. 3d 573, 582 (D.S.C. 2015), *aff'd*, 650 F. App'x 159 (4th Cir. 2016); *see also*

7

*Morris v. Auto-Owners Ins. Co.*, No. 3:16-CV-00880-JMC, 2016 WL 7473430, at *3 (D.S.C. Dec. 29, 2016) ("Both parties agree that South Carolina law applies to the interpretation of the policy, and that is the law the court applies.").

Under South Carolina law, "[i]nsurance policies are subject to the general rules of contract construction." *B.L.G. Enterprises, Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999). Courts "must give policy language its plain, ordinary, and popular meaning." *Id.* "When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used." *Id.*; *see also Bowman v. Standard Fire Ins. Co.*, 397 F. App'x 886, 888 (4th Cir. 2010) (explaining South Carolina principles of insurance policy construction).

Here, the parties' dispute focuses on the meaning of the term "actual cash value," which is not defined by the Policies. As the South Carolina Supreme Court has explained, an insurance policy provision is "not ambiguous merely because its terms are undefined in the policy." *Bardsley v. Gov't Employees Ins. Co.*, 747 S.E.2d 436, 440 (S.C. 2013). Rather, "[i]t is a well-settled principle of contract interpretation that absent a contractual definition to the contrary, contract language is given its ordinary and plain meaning." *Id.* "If policy language was rendered ambiguous simply because it was not defined, insurance policies would need to contain definitions for every word in order to avoid ambiguity, a requirement which would be absurd. To say that any word that is not defined is ambiguous is to ignore the utility of human language. We use words because they have commonly accepted meanings, and it is only when they are subject to more than one meaning as used in a particular policy that they may become ambiguous." *Id.*; *see also Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85, 91 (S.C. Ct. App. 2011) ("The term 'series' is not defined in the endorsements, so it must be defined according to the usual understanding of the ordinary person."); *Ex parte United Servs. Auto. Ass'n*, 614 S.E.2d 652, 654 (S.C. Ct. App. 2005)

("Where a term is not defined in a policy, it is to be defined according to the usual understanding of the term's significance to the ordinary person.") (internal quotations omitted).

## II.    AN ORDINARY PERSON WOULD UNDERSTAND THAT "ACTUAL CASH VALUE" MEANS ACTUAL ECONOMIC VALUE

There is no dispute that, under the terms of the Policies, Plaintiffs were entitled to be paid the ACV of the damage to their property. (First Am. Compl., ¶ 106.) The Policies provide that Defendants "will pay no more than the actual cash value of the damage until actual repair or replacement is complete." (Butler Policy, Form HO-3 (10-06), at 15 (Ex. 1 hereto); *see also* Stewart Policy, Form HO-3 (06-91), at 12-13 (Ex. 2 hereto).) The Policies further provide that "[y]ou [i.e., Plaintiff] may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis." (Butler Policy, Form HO-3 (10-06), at 15 (Ex. 1 hereto); *see also* Stewart Policy, Form HO-3 (06-91), at 12-13 (Ex. 2 hereto).) Neither Butler nor Stewart alleges that she completed the repairs to her property. Accordingly, based on Plaintiffs' allegations, Defendants' obligations under the Policies therefore were limited to paying the ACV of the covered damage.

Under well-settled principles of insurance policy construction in South Carolina, the words "actual cash value" must be given their "ordinary and plain meaning," *Bardsley*, 747 S.E.2d at 440, in other words, "the usual understanding of the ordinary person." *Beaufort Cty.*, 709 S.E.2d at 91; *see also Ex parte United Servs. Auto. Ass'n*, 614 S.E.2d at 654 (undefined term must be given "the usual understanding of the term's significance to the ordinary person").

An ordinary person would understand the words "actual cash value" to mean the actual value, in cash, of the damaged property, or in other words, its actual economic value. A seminal case nationally on ACV insurance is *McAnarney v. Newark Fire Ins. Co.*, 159 N.E. 902 (N.Y. 1928), in which the New York Court of Appeals explained that "[w]e interpret 'actual cash value'

to have no other significance than 'actual value' expressed in terms of money." *Id.* at 903 (emphasis added). As the Nebraska Supreme Court more recently explained, "actual cash value must . . . be measured as an economic unit, i.e., related to what, in terms of value, one could receive for his or her property." *Henn v. American Family Mutual Ins. Co.*, 894 N.W.2d 179, 185 (Neb. 2017) (quoting *Erin Rancho Motels, Inc. v. United States Fid. & Guar. Co.*, 352 N.W.2d 561, 565 (Neb. 1984); *see also Lampe Mkt. Co. v. Alliance Ins. Co.*, 22 N.W.2d 427, 428-29 (S.D. 1946) (ACV means "'actual value' expressed in terms of money"); *Tyler v. Shelter Mut. Ins. Co.*, 184 P.3d 496, 501 (Okla. 2008) (actual cash value means "the actual value of property expressed in terms of money"). The South Carolina Supreme Court has addressed the meaning of ACV only once, but in doing so stated similarly that "[t]o sum up, 'actual cash value' means the <u>actual value expressed in terms of money</u> of the thing for the purpose for which it was used; in other words, the real value to replace." *S.C. Elec. & Gas Co. v. Aetna Ins. Co.*, 120 S.E.2d 111 (S.C. 1961) (emphasis added).

Under the plain meaning of ACV, i.e., actual economic value, depreciation must be true and accurate. A correctly-applied deduction for depreciation ensures that the insured receives the actual economic value of the damaged property, and does not receive the economic, financial benefit that accrues from, for example, replacing an old roof with a brand new one that will last 30 years, or replacing 30-year-old kitchen cabinets with brand new ones. It is common sense that a prospective house buyer pays more for a house with a brand-new roof or new kitchen than an old roof or an old kitchen. To illustrate this with a concrete example, assume that a roof is damaged by a hailstorm and requires complete replacement. The estimated replacement cost (the cost of a brand-new roof) is $10,000, $4,000 of which represents the cost of materials and $6,000 of which represents the cost of labor. Because the roof was 18 years old when the damage occurred and was

expected to last a total of 20 years, assume that the appropriate depreciation is 90% (i.e., 18 divided by 20).  Here is how Plaintiffs' position regarding the economic value of what was damaged (an 18-year-old roof) compares to Defendants' position:

|  | Plaintiffs' Position | Travelers' Position |
|---|---|---|
| Estimated Labor | $6,000 | $6,000 |
| Estimated Materials | $4,000 | $4,000 |
| Estimated Replacement Cost | $10,000 | $10,000 |
| Estimated Depreciation | -$3,600 (90% applied to materials only) | -$9,000 (90% applied to estimated replacement cost) |
| Estimated Actual Cash Value | $6,400 | $1,000 |

Defendants' position is the correct measure of ACV because it measures the actual economic value of the 18-year-old roof.  Given that a brand-new roof would cost approximately $10,000, and the old roof had only 10% of its useful life remaining, the actual economic value of the old roof to a reasonable, knowledgeable person interested in buying the house prior to the loss would have been $1,000. Such a buyer would have recognized that the roof would have to be replaced very soon, and would have taken that into account in deciding how much to offer in buying the house. In contrast, Plaintiffs' proposed calculation reaches a result ($6,400) that is more than six times the actual economic value of the roof prior to the loss.  A reasonable person, familiar with the condition of the roof and the cost of roof replacement, buying the house the day before the loss occurred, would not pay $6,400 in value for a roof that was near the end of its life expectancy and would cost $10,000 to replace within the next two years. Yet, under Plaintiffs' legal valuation rule, the insurer would be required to pay $6,400 for a roof that a reasonable buyer would value at only $1,000.  Put another way, Plaintiffs' proposed legal valuation rule would require the insurer to indemnify the insured, at the initial, ACV stage of the claim, for more than

the actual economic loss sustained.[5]

The South Carolina Department of Insurance explained how ACV is estimated when it published a "Post-Disaster Claims Guide." This guide uses an example similar to the example above, explaining how, when the cost to replace a roof is valued at $15,000 and the roof is ten years old, depreciation might be applied at a rate of $1,000 per year for ten years, resulting in a payment of $4,000 under ACV coverage (after subtraction of a $1,000 deductible) versus $14,000 under replacement cost coverage. (Exhibit 3, at 11.) The Department of Insurance further explains that if a roof has an expected useful life of 25 years, and the roof is 20 years old, "an ACV policy may pay as little as 20% of the cost to replace the roof . . . ." *Id.* at 12. This type of calculation applies straight-line depreciation (i.e., 20/25 = 80% depreciation) to the full replacement cost of the roof, and does not segregate materials from labor in applying depreciation. Both of these examples published by the South Carolina Department of Insurance are squarely inconsistent with Plaintiffs' proposed approach of depreciating only the cost of materials.

## III.    PLAINTIFFS' PROPOSED INTERPRETATION OF "ACTUAL CASH VALUE" IS CONTRARY TO THE HISTORY AND PURPOSE OF ACV INSURANCE

### A.    Background on the History and Purpose of ACV Insurance

Insurers have been writing property insurance policies providing ACV coverage in South Carolina since at least 1892, and in the United States since at least the 1840s. *See*, *e.g.*, *Stickley v. Mobile Ins. Co.*, 16 S.E. 280, 284 (S.C. 1892) (quoting insurance policy provision in use at that time providing for "the loss or damage to be estimated according to the actual cash value of the property at the time of the loss"); *Ulmer v. Phoenix Fire Ins. Co.*, 39 S.E. 712, 712 (S.C. 1901)

---

[5] Significantly, the fact that, at the initial ACV stage of the claim, the insured would be entitled to only the actual value of the lost 18-year-old roof does **_not_** mean that the insured would not be able to recover the cost of replacing the 18-year-old roof with a brand new roof ($10,000) minus the applicable deductible. Rather, under Plaintiffs' Policies, Plaintiffs would be able to recover on a replacement cost basis, and thereby receive an economic gain, simply by making the repairs (or at least entering into a contract to do so).

(quoting standard policy providing that "the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused"); *Mutual Safety Ins. Co. v. Hone*, 2 N.Y. 235, 243 (1849) (quoting insurance policy providing for "the loss or damage to be estimated according to the true and actual cash value of the said property at the time the same shall happen").

In recent decades, insurers have provided two distinct types of casualty protection for buildings. "One insures to the extent of the 'actual cash value,' i.e., the diminution in value; and the other insures to the extent of 'the full cost of repair or replacement without deduction for depreciation . . . .'" *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind. 1982); *see also In re State Farm Fire & Cas. Co. ("Labrier")*, 872 F.3d 567, 575 (8th Cir. 2017) (describing post-World War II advent of replacement cost coverage).

As the South Carolina Supreme Court has explained, replacement cost insurance was "previously called depreciation insurance." *Columbia College v. Pennsylvania Ins. Co.*, 157 S.E.2d 416, 423 (S.C. 1967). "If one is paid actual cash value for the destruction of a building which is, by reason of depreciation, worth only one-half of its replacement cost, the insured is in no financial condition to replace the building. Replacement cost insurance was devised to provide money for reconstruction. In effect, the insurer, under this plan, agrees to pay not only actual value but also the difference between actual cash value and full replacement cost." *Id.* Replacement cost coverage "is obviously held out to the insurance buyer as an increased benefit to <u>bridge the gap between the value of a used building and the cost of replacing the same</u>." *Id.* at 425 (emphasis added).

What is now the predominant form of property insurance coverage provides combined coverage, in the sense that coverage is provided on an ACV basis unless and until the insured repairs

or replaces the damaged property.[6] After repair or replacement is completed, a supplemental payment is made so that the total amount paid is the full cost of repair or replacement of covered damage (subject to the deductible and any other applicable provisions of the policy).  *See Nat'l Sec. Fire & Cas. Co. v. DeWitt*, 85 So. 3d 355, 374 (Ala. 2011). This is the type of policy that Plaintiffs purchased from Defendants in this case, as explained above.

ACV coverage is based on the principle of indemnity, that is, "[t]he insured who suffers a covered loss is entitled to receive full, but not more than full, value for the loss suffered, to be made whole but not be put in a better position than before the loss." *Labrier*, 872 F.3d at 573; *see also Joseph v. Sears Roebuck & Co.*, 77 S.E.2d 583, 587 (S.C. 1953) ("An insurance contract is likewise a contract of indemnity. The insurer undertakes to indemnify another against loss, damage or liability arising from an unknown or contingent event."). "The limitation of property loss coverage to the insured's actual loss serves the public policy of preventing over-insurance, which can be an 'inducement to destroy property in order to procure the insurance upon it.'" *Labrier*, 872 F.3d at 573 (quoting *Daggs v. Orient Ins. Co. of Hartford*, 38 S.W. 85, 87 (Mo. 1896), *aff'd*, 172 U.S. 557 (1899); *see also D & S Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1, 12 (Neb. 2012); *Higgins v. Insurance Co. of N. Am.*, 469 P.2d 766, 773 (Or. 1970). As the Eighth Circuit has explained, "[b]y adhering to the core principle of indemnity," ACV coverage "limits the insured's covered loss to the value of the damaged asset at the time of the loss . . . ." *Labrier*, 872 F.3d at 575. Thus, "the insured, not the insurer, is responsible for the cash difference necessary to replace the old property with new property." *D&S Realty*, 816 N.W.2d at 11.

If insureds purchase replacement cost policies, however, as Plaintiffs did here, they can receive a supplemental payment to cover the full cost of replacing old property with new property

---

[6] Part of the ACV payment is typically used to pay a deposit to a contractor to start the repairs.

(and thereby receive an economic gain) simply by making the repairs and submitting a supplemental claim to the insurer. It appears there would be no dispute here if Plaintiffs had simply completed the repairs to their properties and made such supplemental claims. *See Graves v. Am. Family Mut. Ins. Co.*, 686 Fed. Appx. 536, 539 (10th Cir. 2017) ("Had [plaintiff] wanted to recover the full replacement cost under her policy she should have had the repairs completed by the one-year deadline.").

### B.    Court Decisions and Insurance Adjustment Manuals Have Long Recognized That Depreciation is Properly Applied to the Full Cost of Repair or Replacement

Courts have long recognized—since the 19th century—that when the cost approach is used to estimate ACV, depreciation is properly applied to the full cost of repair or replacement of damaged property, not merely to one component of value (such as the value of materials but not labor). Back in 1886, in *Commercial Fire Ins. Co. v. Allen*, 1 So. 202 (Ala. 1886), the Alabama Supreme Court explained that "[i]f property had been destroyed which, from use or otherwise, had become less valuable than when new, then *the cost of repairing it, less the percentage of depreciation of the destroyed article* by such use, will determine the extent of the damages." *Id.* at 208; *see also Providence Washington Ins. Co. v. Gulinson*, 215 P. 154, 155 (Colo. 1923) ("If $3016 was the cost of repairs it should have been reduced for depreciation at something like the same rate as the cost of the whole reconstruction, 50 per cent."); *Boise Ass'n of Credit Men v. United States Fire Ins. Co.*, 256 P. 523, 527 (Idaho 1927) (determining lowest permissible valuation of building based on the evidence of replacement cost and percentage of depreciation per year applied thereto); *Wisconsin Screw Co. v. Fireman's Fund Ins. Co.*, 297 F.2d 697, 701 (7th Cir. 1962) (affirming district court judgment determining ACV as replacement cost less 50% depreciation); *Knuppel v. American Ins. Co.*, 269 F.2d 163, 166 (7th Cir. 1959) (affirming district court judgment determining ACV based on testimony regarding replacement cost less depreciation of 2% per year

of the building's age); *Svea Fire & Life Ins. Co. v. State Sav. & Loan Ass'n*, 19 F.2d 134, 136 (8th Cir. 1927) (under Oklahoma law, affirming jury verdict that was consistent with testimony regarding cost of repair less 25% depreciation); *Real Asset Management v. Lloyd's of London*, 61 F.3d 1223, 1230 (5th Cir. 1995) (recognizing that ACV was properly determined by applying a depreciation percentage to full replacement cost).

Insurance adjusting manuals dating back many years confirm that depreciation was applied at that time, as it is today, as a percentage of the replacement cost, not based on the cost of the materials only. In one handbook from 1924, the author describes a straight-line method of depreciation that applies as a percentage of the full replacement cost: "Suppose half a dozen good contractors agree that it would cost $100,000 to reproduce a certain building at current rates, but that it was 20 years old, how much would it be worth? Three of them might set a life-time at 40 years, and the other three at 50. In the one case there would be an annual depreciation of 2 ½ per cent to deduct, and in the other 2 [percent]." William Arthur, APPRAISERS' AND ADJUSTERS' HANDBOOK 36 (1924) (Ex. 4 hereto). Nothing in this handbook indicates that adjusters were ever instructed to apply depreciation only to the materials portion of the replacement cost. *Id.* at 34-37, 47-48; *see also* Prentiss B. Reed, ADJUSTMENT OF FIRE LOSSES 58-62 (1929) (Ex. 5 hereto). Another handbook from 1982 describes how depreciation is applied to the full replacement cost of a damaged roof, not merely to the cost of the shingles:

> On a partial loss to a structure, depreciation is based on the life span of each item in the building that is damaged. A four-year-old hail-damaged roof with a life expectancy of 20 years, for example, which costs $5,000 to replace, would be depreciated 20 percent (1/5 of $5,000 or $1,000) even though the dwelling may be 65 years old.

Robert J. Prahl, CPCU, INTRODUCTION TO CLAIMS 88 (Insurance Institute of America 1988) (Ex. 6 hereto).[7]

## IV.    THE STRONG WEIGHT OF WELL-REASONED APPELLATE AUTHORITY ON POINT SUPPORTS DEFENDANTS' POSITION

### A.    Five Appellate Decisions Support Defendants' Position

Appellate decisions on the same issue presented here by the Eighth Circuit, Tenth Circuit, Nebraska Supreme Court, Oklahoma Supreme Court and Minnesota Supreme Court all strongly support Defendants' position. In *Labrier*, the Eighth Circuit, applying Missouri law, concluded that the insurer properly determined ACV by applying depreciation to the full replacement cost, rejecting the same position advocated by Plaintiffs here. The court explained that under ACV coverage, "[t]he insured who suffers a covered loss is entitled to receive full, but not more than full, value for the loss suffered, to be made whole but not be put in a better position than before the loss." *Labrier*, 872 F.3d at 573. "The limitation of property loss coverage to the insured's actual loss serves the public policy of preventing over-insurance . . . ." *Id.* The court further explained that "[w]hile the term 'actual cash value' has an unambiguous meaning under Missouri law—the difference in the fair market value of the damaged property immediately before and after the loss—it is a value that must be estimated," and "a 'depreciation' deduction is the most common, but not the only acceptable method of estimating the reduced fair market value of damaged property." *Id.*

---

[7] Plaintiffs' First Amended Complaint cites two articles that they contend suggest that depreciation was traditionally applied only to the materials component of replacement cost. (First Am. Compl. ¶ 52.) Neither of these articles is an insurance adjustment manual or other document created by an insurance industry source. The first article is written by two public insurance adjusters, who represent insureds in pursuing insurance claims, in exchange for a percentage of the amount recovered. *See* https://suncoastclaims.com/about/. The article argues that "courts have erred in including labor in depreciation calculations." Don Wood et al., "Insurance Recovery After Hurricane Sandy: Correcting the Improper Depreciation of Intangibles Under Property Insurance Policies," N.Y. State Bar Ass'n Torts, Insurance & Compensation Law Section Journal, vol. 42 no.1, at 22 (Winter 2013). The second article is a blog post written by a plaintiffs' attorney who specializes in suing insurance companies (describing himself as "The Policyholder's Advocate"), and acknowledges that courts have reached conflicting results on the "labor depreciation" issue. Chip Merlin, "Few Judges and Insurance Regulators Worked in Property Claims: Understanding New Depreciation Rulings," Property Insurance Coverage Law Blog (Aug. 16, 2017).

at 574. The Eighth Circuit went on to explain that "'[d]epreciation' is a concept with a well understood meaning—'decline in an asset's value because of use, wear, obsolescence, or age.'" *Id.* (quoting BLACK'S LAW DICTIONARY (9th ed. 2004)). The court noted that "Black's Law Dictionary lists no fewer than ten different depreciation methods to estimate the decline in an asset's value over time. <u>All deduct depreciation from the initial full cost of the damaged asset</u>, because that was the insured's investment." *Id.* (emphasis added). After further explaining the difference between ACV and replacement cost coverage, the Eighth Circuit concluded that "determining actual cash value by depreciating replacement cost—the method employed by State Farm in this case and apparently by most property insurers nationwide—is an eminently practical and reasonable method for making an initial estimate of actual cash value at the time of loss." *Id.* at 576. The court noted that "a more precise estimate of [ACV] would depreciate the full original cost of the asset to account for its decline in value over time," and "State Farm's depreciation method reasonably substitutes replacement cost for original cost because that value is more readily available and to the insured's advantage." *Id.* The Eighth Circuit also concluded that the issue presented was inappropriate for class certification because it "may only be determined based on all the facts surrounding a particular insured's partial loss," and remanded with instructions to dismiss the complaint on the merits. *Id.* at 577.

The Tenth Circuit reached a similar result in *Graves v. Am. Family Mut. Ins. Co.*, 686 Fed. Appx. 536 (10th Cir. 2017) (unpublished), affirming a summary judgment decision in favor of the insurer in a "labor depreciation" putative class action. Agreeing with the Oklahoma Supreme Court's decision in *Redcorn* (discussed below), the Tenth Circuit reasoned that "if [the insurer] could depreciate only the cost of materials in determining the actual cash value of [plaintiff's] loss, she would receive a windfall based on labor costs she never incurred with respect to her kitchen

18

ceiling. Such a result is contrary to the principle of indemnity because she would be in a better position than she was before the damage occurred. Had she wanted to recover the full replacement cost under her policy she should have had the repairs completed by the one-year deadline." *Id.* at 539. The Tenth Circuit further explained that "*Black's Law Dictionary* describes ten different depreciation methods, none of which involves distinguishing materials from labor costs. Rather, its descriptions focus on the asset itself and various approaches to determining its value as a whole. Based on the plain and ordinary meaning of 'depreciation,' a reasonably prudent insured would not expect the insurer to apply such an unorthodox depreciation method when determining actual cash value." *Id.* at 540 (emphasis added). Rather, "a reasonably prudent insured would understand 'depreciation' to mean a decline in an asset's overall value." *Id.* The Tenth Circuit held that "[b]ecause [the insurer] did not impermissibly depreciate labor costs in determining the actual cash value of [plaintiff's] loss, no additional amount was due under the policy . . . ." *Id.*

The supreme courts of Oklahoma, Nebraska and Minnesota have also ruled in favor of insurers on the same issue presented here. The first of these decisions was *Redcorn v. State Farm Fire & Casualty Co.*, 55 P.3d 1017 (Okla. 2002), which answered a certified question from a federal district court regarding whether, in determining ACV using a replacement-cost-less-depreciation method, depreciation may be applied to the full replacement cost, including the labor component thereof. The Oklahoma Supreme Court noted that it had previously followed the "broad evidence rule," under which the determination of ACV is "a matter of fact to be determined by a consideration of all relevant factors and circumstances existing at the time of loss." *Id.* at 1020. The court noted that insurance law is based on the principle of indemnity, and "[t]he goal of indemnity is to place the insured in as good a condition, so far as practicable, as he would have been if no fire had occurred." *Id.* The insured argued that depreciation should not be applied to the

labor cost component of replacement cost value because "if it were possible to purchase depreciated shingles, the cost of the labor to install them would be the same as the cost of installing new shingles." *Id.* The Oklahoma Supreme Court rejected this argument, explaining that "[a] roof does not have a separate market value from the building it covers," and "[a] building is the product of both materials and labor." *Id.* The court further reasoned that the policy "insured a roof surface, not two components, material and labor," the plaintiff "did not pay for a hybrid policy of actual cash value for roofing materials and replacement costs for labor," and "[t]o construe the policy in such a manner would unjustly enrich the policy holder." *Id.* at 1021.[8]

The Minnesota Supreme Court addressed the same issue in *Wilcox v. State Farm Fire & Cas. Co.*, 874 N.W.2d 780 (Minn. 2016), in answering a similar certified question from a federal district court. The Minnesota Supreme Court concluded that "[t]he term 'actual cash value' is not ambiguous," and that "'actual cash value' is a legal term of art that refers to the 'actual loss' sustained by the insured." *Id.* at 784. The court further concluded that the plaintiffs "do not advance a reasonable interpretation of the phrase 'actual cash value' that would categorically exclude embedded-labor-cost depreciation under every circumstance." *Id.* The court noted that it had previously followed the "broad evidence rule" with respect to ACV, and that "the broad evidence rule does not dictate whether labor is depreciable or is not depreciable. Rather, under the broad evidence rule, embedded-labor-cost depreciation is one factor that the trier of fact may *consider* and weigh among other factors to determine the actual cash value of the damaged property." *Id.* at 785. The court held that "whether embedded-labor-cost depreciation is logical or helpful to the trier of fact is ultimately a question of fact, not law," and "[w]hen a homeowner's insurance policy

---

[8] A dissenting opinion in *Redcorn* concluded that "[a] roof is not a unified product but a combination of a product (shingles) and a service (labor to install the shingles)," and that it would be "illogical" to apply depreciation to labor. *Id.* at 1022 (Boudreau, J., dissenting). Several other courts have disagreed with this reasoning as contrary to the manner in which property is accurately valued. *See, e.g.*, *Henn*, 894 N.W.2d at 873 (discussed further below).

does not define the term 'actual cash value' or otherwise state whether embedded labor costs are depreciable for the purpose of calculating actual cash value, the trier of fact may consider embedded-labor-cost depreciation when such evidence logically tends to establish the actual cash value of a covered loss." *Id.*

The Nebraska Supreme Court answered a similar certified question in *Henn v. American Family Mut. Ins. Co.*, 894 N.W.2d 179 (Neb. 2017). The court noted that it had recognized three approaches to estimating ACV—market value, replacement-cost-less-depreciation, and the "broad evidence rule." *Id.* at 184-85. The court explained that "under each of the approaches, it is a well-accepted principle that '[a]ctual cash value is the value of the property in its depreciated condition.'" *Id.* at 186. The court further explained that ACV is "a representation of the depreciated value of the property immediately prior to damages." *Id.* at 873. The court agreed with the majority in *Redcorn* that "both materials and labor constitute relevant facts to consider when establishing the value of the property immediately prior to the loss," and "absent specific language in the policy, the insured does 'not pay for a hybrid policy of actual cash value for roofing materials and replacement costs for labor," further noting that "[t]he property is a product of both materials and labor." *Id.* at 874-85. The court held that "[t]he unambiguous definition of actual cash value is a depreciation of the whole," and "an insured is properly indemnified when the amount calculated for actual cash value equals the depreciated value of the property just prior to the loss, which includes both materials and labor." *Id.* at 875. The court further reasoned that "[t]he policy does not distinguish between materials and labor, and we refuse to read that distinction into the policy." *Id.* at 876.

**B.      The South Carolina Supreme Court Is Likely to Follow the Majority Rule**

The only decision in which the South Carolina Supreme Court has addressed ACV demonstrates that it is likely to follow the majority rule set forth by the five appellate decisions discussed above. In *S.C. Elec. & Gas Co. v. Aetna Ins. Co.*, 120 S.E.2d 111 (S.C. 1961), a case involving damage to a generator, the South Carolina Supreme Court approved of a jury instruction defining ACV as follows: "[t]he measure of damages under the loss may be arrived at by determining the <u>difference between the value of the damaged property immediately before and immediately after the fire</u>." *S.C. Elec. & Gas Co. v. Aetna Ins. Co.*, 120 S.E.2d 111, 117 (S.C. 1961) (emphasis added). The jury instruction went on to explain depreciation as follows:

> I charge you further that the property which was destroyed or damaged on June 27, 1950, had been in use since 1930. Therefore, in determining the actual value in 1950, you may consider the new value or cost thereof and take into consideration <u>any depreciation</u> of the property between 1930 and 1950 to be deducted from the new value or cost. In other words, Mr. Foreman and gentlemen, I charge you that that is one thing that you may consider in arriving at damages. It's not the only rule, it's nothing final or conclusive, but it's one rule that you may follow, if you find that the plaintiffs are entitled to recover.

*Id.* (emphasis added). The South Carolina Supreme Court further stated: "To sum up, 'actual cash value' means <u>the actual value expressed in terms of money</u> of the thing for the purpose for which it was used; in other words, the real value to replace." *Id.* at 118 (emphasis added). These statements by the South Carolina Supreme Court demonstrate that it is likely to follow the decisions cited above, under which ACV is the actual economic value of the damaged property, and when the replacement-cost-less-depreciation method is used for estimating ACV, it must be applied in a manner that is consistent with the true and accurate value of property. *See, e.g.*, *Henn*, 894 N.W.2d at 875 ("an insured is properly indemnified when the amount calculated for actual cash value equals the depreciated value of the property just prior to the loss, which includes both materials and labor"). This is also consistent with the South Carolina Department of Insurance's

"Post-Disaster Claims Guide," as discussed above. *See* Ex. 3, at 11-12.

Predicting that South Carolina would follow the majority rule is also consistent with the principle of South Carolina insurance law that an undefined term used in an insurance policy "must be defined according to the usual understanding of the ordinary person." *Beaufort Cty. Sch. Dist.*, 709 S.E.2d at 91. As the Tenth Circuit reasoned in rejecting the approach advocated by Plaintiffs here, "a reasonably prudent insured would not expect the insurer to apply such an unorthodox depreciation method when determining actual cash value"; rather, "a reasonably prudent insured would understand 'depreciation' to mean a decline in an asset's overall value." *Graves*, 686 Fed. Appx. at 540.

In the First Amended Complaint (at paragraph 52), Plaintiffs focus on a statement by the South Carolina Supreme Court in *S.C. Elec. & Gas* that "[t]here was testimony to the effect that the actual cost of the new coils, in place, was $132,181, of which $90,300, representing the cost of materials, would be depreciable, and the balance, $41,881, representing cost of winding and installation, would not be depreciable." *Id.* at 118. While this was merely a recitation of testimony in the case and not a holding or even dictum of the court with respect to the meaning of ACV, this statement is fully consistent with Defendants' position. This case involved a piece of equipment (generator). Whether such equipment is real property or personal property may depend on the nature of the installation, and can be debatable in some cases as a matter of property law. The installation of a piece of equipment or appliance in some circumstances may not add value to or even become part of the building as a whole (the value of which depreciates over time), in contrast to, for example, building a new wall or a putting on a new roof. For similar reasons, Defendants do not apply depreciation to cleaning costs because that is part of regular maintenance of property, not the addition of new components that add value to the property as a whole (which then

depreciates over time). *See*, *e.g.*, First Am. Compl. Ex. A, at 3 (estimate on Butler Loss, applying no depreciation to "Clean masonry" and "Clean with pressure/chemical spray"). This is why the valuation of property damage, including application of depreciation, involves case-by-case factual determinations. *See Wilcox*, 874 N.W.2d at 785 ("the trier of fact may consider embedded-labor-cost depreciation when such evidence logically tends to establish the actual cash value of a covered loss").

### C.    South Carolina Is Unlikely to Follow the Minority Decisions

Appellate decisions in Arkansas, Tennessee and the Sixth Circuit (applying Kentucky law) have ruled in favor of policyholders on the issue presented here, but those decisions are unlikely to be followed in South Carolina. In *Adams v. Cameron Mut. Ins. Co.*, 430 S.W.3d 675 (Ark. 2013), a majority of the Arkansas Supreme Court summarily reached the conclusion that the term "actual cash value" was ambiguous, without considering any of the history of the use of that phrase in insurance policies or even in that court's own prior jurisprudence. *Id.* at 678. The Arkansas majority then agreed with the dissent in *Redcorn* that an insured should not sustain a "significant out-of-pocket loss" in an ACV calculation, *Adams*, 430 S.W.3d at 678-79, disregarding the longstanding principle that under ACV coverage, "the insured, not the insurer, is responsible for the cash difference necessary to replace the old property with new property." *D&S Realty*, 816 N.W.2d at 11.  The Arkansas Supreme Court also relied upon an Arkansas Insurance Department bulletin prohibiting depreciation of labor costs. *Adams*, 430 S.W.3d at 679. In a subsequent decision, a majority of the Arkansas Supreme Court further concluded that as a matter of public policy, in estimating ACV, depreciation could not be applied to the labor cost component of replacement cost value, even where the insurance policy expressly so provided. *Shelter Mut. Ins. Co. v. Goodner*, 477 S.W.3d 512, 515-16 (Ark. 2015). No other court has reached such an outcome. The Arkansas legislature subsequently repudiated the state supreme court decisions by enacting a

statute expressly permitting depreciation of the full replacement cost value, including the labor component thereof, with the use of a notice to policyholders to be approved by the state insurance department. Ark. Code Ann. § 23-88-106.

In *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170 (Tenn. 2019), the Tennessee Supreme Court declined to follow the majority rule. The court recognized that "[t]he generally accepted definition of 'actual cash value' is 'actual value expressed in terms of money,'" and that "there are multiple methods for determining actual cash value, including market value, replacement cost less depreciation, and the broad evidence rule." *Id.* at 174. The court concluded that it had never formally adopted the broad evidence rule. *Id.* at 178. The court found that both parties' interpretations of the insurance policies were "plausible," reasoning that "a homeowner, knowing that replacement costs include both labor and materials to rebuild a roof, would believe that the insurance company would only apply depreciation to the physical materials, those things that actually deteriorated." *Id.* The court further concluded that "an insured should not have to consult a long line of case law or law review articles and treatises" to determine coverage; that the insurer "argue[d] for a technical definition of depreciation"; and that "[t]herefore, construing the policy language in favor of the insured, depreciation can only be applied to the cost of materials, not to labor costs." *Id.* at 179 (quoting *Harrell v. Minn. Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996)). *Lammert* is unlikely to be followed in South Carolina because it is inconsistent with the plain and ordinary meaning of depreciation as applied in numerous other contexts (as discussed further below). Contrary to the Tennessee court's reasoning, a homeowner desiring to ascertain how depreciation works would not have to consult case law or law review articles, but merely look up a basic example of how depreciation is applied to a structure in determining ACV. *See*, *e.g.*, Actual Cash Value Calculator available at https://www.miniwebtool.com/actual-cash-value-

25

calculator/ (visited Oct. 28, 2019).

A divided, unpublished decision of the Sixth Circuit also predicted that Kentucky would not follow what it acknowledged was the majority rule nationwide. In *Hicks v. State Farm Fire & Cas. Co.*, 751 Fed. App'x 703 (6th Cir. 2018) (unpublished), the Sixth Circuit majority explained that "[g]enerally speaking, ACV is the dollar amount required to restore a policyholder to where he or she was before the loss." *Id.* at 706. The majority further noted that Kentucky courts had historically applied the "broad evidence rule," until a regulation was enacted defining ACV as replacement cost less depreciation (except for circumstances where the property's economic value is disproportionate to replacement cost). *Id.* at 706-08. In attempting to predict what the Kentucky Supreme Court would decide, the Sixth Circuit majority concluded that "the contract is ambiguous because it relies on a regulation that is subject to multiple reasonable interpretations," and "[i]n the insurance context, Kentucky applies the reasonable expectations doctrine which interprets ambiguous terms 'in favor of the insured's reasonable expectations.'" *Id.* at 708-09 (quoting *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003)).[9] The majority further concluded that "[a] layperson confronted with State Farm's policy could reasonably interpret the term depreciation to include only the cost of materials," and that "the district court correctly concluded that depreciating labor does not make the policyholder whole but rather frustrates the indemnity purpose of ACV coverage." *Id.* at 709. The majority further concluded that the majority rule, followed in *Henn*, *Wilcox*, *Labrier* and *Graves*, stems from states that "still employ the broad evidence rule, or some form of fair market valuation" in determining ACV. *Id.* at 710.

A dissenting judge concluded that Kentucky would follow the majority rule. The dissent found the majority rule nationwide to be consistent with how "Kentucky law provides that the

---

[9] In South Carolina, the reasonable expectations doctrine "cannot be used to alter the plain terms of an insurance policy." *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 407 (S.C. 2014).

purpose of insurance is to place the insured back in a position to where she was, no better and no worse." *Id.* at 712 (Griffin, J., dissenting). The dissent reasoned that "because the plain meaning of the [Kentucky] ACV regulation broadly provides for any and all depreciation, it is not ambiguous and State Farm may depreciate materials and labor when calculating ACV." *Id.* The dissent further noted that consumer guidance provided by the Kentucky Department of Insurance demonstrated that depreciation would apply to the full cost of replacement, not merely the materials component thereof. *Id.* at 712-13. The dissent further explained that the majority's attempt to distinguish states following the "broad evidence rule" from other states was "a distinction without a difference" because "Kentucky's replacement cost minus depreciation formula is the method to calculate the economic value of damaged property at the time it was damaged." *Id.* at 714.

South Carolina is likely to follow the majority rule and reject the few minority decisions. South Carolina does not have the type of regulation that was at issue in *Hicks*. Consistent with majority rule jurisdictions, the South Carolina Supreme Court has described ACV in terms of actual monetary value and the difference in market value before and after the loss, and has also recognized that a factfinder may apply "any depreciation." *S.C. Elec. & Gas Co.*, 120 S.E.2d at 117-18. South Carolina insurance law also requires that undefined terms such as ACV be given their ordinary meaning. *See supra* at 8-9. South Carolina law is thus consistent with the law of jurisdictions that have followed the majority rule nationwide. *See also Accardi v. Hartford Underwriters Ins. Co.*, No. 18 CVS 2162, 2018 WL 5273971, at *5-6 (N.C. Super. Oct. 22, 2018) (following majority rule in applying North Carolina law, reasoning, *inter alia*, that North Carolina had followed a market value approach to determining ACV, "[plaintiff's] argument for a definition of depreciation that excludes labor costs would require the Court to read into The Policy a

nonexistent provision excluding labor costs from depreciation," and "it does not make logical sense to separate the cost of labor from that of physical materials when evaluating the depreciation of a house or its component parts"); *Papurello v. State Farm Fire & Cas. Co.*, 144 F. Supp. 3d 746, 770 (W.D. Pa. 2015) (following majority rule under Pennsylvania law, explaining that "[w]hen a roof is in issue, as it is here, the 'plain and ordinary' meaning of the 'property' to which the Policy refers is the *finished* product in issue—the result or physical manifestation of combining knowhow, labor, physical materials (including attendant costs, e.g., the incurrence of taxes), and anything else required to produce the final, finished roof itself") (emphasis added); *Cranfield v. State Farm Fire & Cas. Co.*, 340 F. Supp. 3d 670, 673–74 (N.D. Ohio 2018) (following majority rule under Ohio law, explaining, *inter alia*, that "[a]s evidenced by *Black's Law Dictionary*, depreciation commonly focuses on the value of the whole product, rather than the component parts," and "as used in the policy, ACV cannot reasonably be interpreted to exclude labor from a depreciation calculation"; further reasoning that "[t]he policy does not separately insure the labor and building materials, but the sum total of these parts").[10]

## V.    IN OTHER RELEVANT CONTEXTS, DEPRECIATION IS APPLIED TO THE FULL VALUE OF A BUILDING, INCLUDING BOTH LABOR AND MATERIALS

This Court should also take into account how depreciation is applied in other contexts in which the actual economic value of a building (or portion thereof) is determined, including

---

[10] *See also Basham v. United Servs. Auto. Ass'n*, No. 16-CV-03057-RBJ, 2017 WL 3217768, at *2 (D. Colo. July 28, 2017) (following majority rule, explaining, *inter alia*, that "[w]henever property is the indivisible product of materials (stuff) and labor (work), its physical components and the assembly of those pieces will decay over time"); *Ware v. Metro. Prop. & Cas. Ins. Co.*, 220 F. Supp. 3d 1288, 1291 (M.D. Ala. 2016) (following majority rule and granting motion to dismiss, explaining that: "It logically follows that the depreciation allowance includes depreciation of the full estimated cost of repair, which obviously includes materials and labor. Nothing in the policy suggests that only the materials component of that cost of repair should be depreciated or that the repair labor cost should be ignored when determining depreciation.").

property tax assessments, eminent domain, and other valuations of real property. In those contexts, when the cost approach (replacement cost less depreciation) is used, labor costs are *not* segregated from materials costs for purposes of calculating depreciation and determining actual economic value. Rather, depreciation is applied to the total estimated replacement cost. To achieve consistency in South Carolina law, properties should be valued for ACV insurance purposes consistently with how the same properties are valued for other purposes when a replacement-cost-less-depreciation method is used in valuing property. There are no circumstances in which professionals in property valuation depreciate only the portion of replacement cost that is attributable to the cost of materials.

### A.    Property Tax Assessments

As in the insurance context, for purposes of property tax assessments, the cost approach to valuation (i.e., replacement cost less depreciation) is one of the methods used to value buildings. The South Carolina Constitution requires that real property be assessed for tax purposes at a specified percentage of its fair market value. S.C. Const. art. X, sec. 1. South Carolina law further requires that "[a]ll property must be valued for taxation at its true value in money which in all cases is the price which the property would bring following reasonable exposure to the market, where both the seller and the buyer are willing, are not acting under compulsion, and are reasonably well informed of the uses and purposes for which it is adapted and for which it is capable of being used." S.C. Code Ann. § 12-37-930. One of the approaches used to value real estate for property tax purposes, in some circumstances, is the cost approach, which involves estimating replacement cost and subtracting depreciation from the full replacement cost (without segregating labor costs from materials costs for purposes of depreciation, as Plaintiff advocates). *See*, *e.g.*, *Hull v. Spartanburg Cty. Assessor*, 641 S.E.2d 909, 911 (S.C. Ct. App. 2007) ("At least four methods exist for determining fair market value of property for taxation purposes: analysis of comparable sales,

29

capitalization of gross income, capitalization of net income, and reproduction cost less depreciation and obsolescence.") (quoting 72 Am.Jur.2d State and Local Taxation § 669 (2001)).

The leading treatise on property tax assessment, entitled PROPERTY ASSESSMENT VALUATION, is published by the International Association of Assessing Officers.  Here is an example from that treatise regarding calculation of depreciation when using the cost approach:

> Effective age                =                Depreciation
> Total economic life
> (effective age + remaining economic life)
>
> By using the [above] formula for depreciation, what is the depreciation suffered by the following single-family residence and its corresponding improvement value if the cost new of the residence is $400,000?  The total economic life of the residence is estimated to be 50 years, and the appraiser has determined that 5 years is the effective age for the residence.
> Effective age                              5 years
> Divided by total economic life            50 years
> **Equals depreciation**                   **10%**
> Cost new                                  $400,000
> **Less depreciation**                     **$40,000**
> Improvement value                         $360,000

Garth E. Thimgan, CAE et al., PROPERTY ASSESSMENT VALUATION (International Ass'n of Assessing Officers 3d ed.) at 273 (emphasis added).

The example could not be clearer: when using the cost approach to calculate property value, depreciation is applied to the *entire* replacement cost value. There is no reason why the cost approach to valuation should be applied in a fundamentally different manner for ACV insurance purposes than the cost approach is applied for property tax valuation purposes.

### B.        Eminent Domain and Other Real Estate Valuations

In the context of valuing property being taken by eminent domain, under South Carolina law, a property owner is "entitled to the fair market value of her property at the time of the taking," which is the "price which a willing buyer will pay a willing seller, neither being under compulsion to buy or sell and both being fully informed of all uses to which the property is adopted and for

30

which it is capable of being used." *Hous. Auth. of City of Charleston v. Olasov*, 320 S.E.2d 478, 481 (S.C. Ct. App. 1984). Eminent domain proceedings typically involve the testimony of licensed appraisers. Persons seeking to be licensed as real estate appraisers by the South Carolina Real Estate Appraisers Board are required to learn the cost approach along with other methods of property valuation. *See* S.C. Code § 40-60-30 et seq.; S.C. Code of Regs. R. 137-100.02(C), (D), (E), 137-900.05(C), (D), (E). Licensed appraisers are also required to complete continuing education requirements. S.C. Code § 40-60-35. One of the approved course providers is the Appraisal Institute. *See* https://llr.sc.gov/appr/PDF/Forms/Doc400.pdf. The leading appraisal treatise, entitled THE APPRAISAL OF REAL ESTATE, is published by the Appraisal Institute. Here is an example from that treatise regarding calculation of depreciation when using the cost approach to determine the value of property:

> The total percentage of depreciation (36%) is determined by dividing the estimated effective age of 18 years by the total economic life expectancy of 50 years (Step 2). Thus, the economic age-life formula indicates total depreciation of 36%. When this rate is applied to the cost of $668,175, the total depreciation is $240,543 (Step 3). The cost approach is applied as follows:
>
> | | |
> |---|---|
> | Total [replacement] cost | $668,175 |
> | Less total depreciation | - 240,543 |
> | Depreciated cost | $427,632 |
> | Plus land value | +180,000 |
> | Indicated value by the cost approach | $607,632 |

Appraisal Institute, THE APPRAISAL OF REAL ESTATE 386 (13th ed. 2008).

This example further demonstrates that, when using the cost approach to calculate market value, depreciation is applied to the entire replacement cost value of the structure. This is fully consistent with how the replacement-cost-less-depreciation methodology has been utilized for purposes of real estate assessments, eminent domain valuations, insurance adjustments and other purposes for decades. South Carolina statutes and regulations require this type of depreciation

methodology to be used for various purposes. *See* S.C. Code Ann. § 58-31-350 (requiring that electrical utility property be valued for "just compensation" purposes based on "[r]eproduction cost, new, of the facilities being acquired, less depreciation on a straight line basis"); S.C. Code Ann. § 58-27-1360 (similar); S.C. Code Regs. R. 19-410.3 (requiring that certain state buildings be depreciated based on "amount of expiration of the useful life of the buildings using the straight-line method with a twenty year base").[11]

Applying depreciation only to the materials portion of replacement cost value would be contrary to how depreciation is applied in the context of property tax assessments and basic principles of real estate appraisal. This would mean that the same South Carolina court, when applying the cost approach to valuation (i.e., replacement cost less depreciation), would value the same property in inconsistent ways, depending on whether the valuation is for purposes of a property tax assessment, real estate appraisal, or ACV insurance purposes. That would be an inefficient and nonsensical approach.

## VI.    BOTH THE BREACH OF CONTRACT CLAIM AND DECLARATORY JUDGMENT CLAIM SHOULD BE DISMISSED

Based on the arguments set forth above, all of Plaintiffs' claims should be dismissed. The breach of contract claim (Count I) is premised exclusively on Plaintiffs' claim that "Travelers breached its contractual duty to pay Plaintiffs and members of the proposed class the ACV of their claims by unlawfully withholding labor as depreciation." (First Am. Compl. ¶ 107.) Because Defendants had no such contractual duty, this claim should be dismissed as a matter of law. *See*, *e.g.*, *Papurello*, 144 F. Supp. 3d at 771 (granting Rule 12(b)(6) motion to dismiss because breach

---

[11]  The Internal Revenue Service applies depreciation in a similar manner. If a taxpayer builds a structure, the cost of the labor and materials is included in the taxpayer's basis, and an appropriate rate of depreciation (depending on the category of property) is applied to the taxpayer's full basis. (IRS Publication No. 551 (rev. May 2002), at 3; IRS Publication No. 946 (Feb. 15, 2013 version), at 44.)

of contract claim alleging improper "labor depreciation" failed as a matter of law); *Cranfield*, 340 F. Supp. 3d at 677 (same result).

The declaratory judgment claim (Count II) is similarly premised entirely on Plaintiffs' theory that "Travelers' property insurance contracts prohibit the withholding of labor costs as depreciation when adjusting partial losses under the methodology employed here." (First Am. Compl., ¶ 116.) Given that this theory is incorrect as a matter of law and overlaps with the breach of contract claim, the declaratory judgment claim should be dismissed. *See*, *e.g.*, *Hanback v. DRHI, Inc.*, 647 F. App'x 207, 209 (4th Cir. 2016) (affirming dismissal of declaratory judgment claim, where breach of contract claim was dismissed and was based on same legal theory); *Planet Earth TV, LLC v. Level 3 Commc'ns, LLC*, No. 1:17-CV-00090-MR-DLH, 2018 WL 3660205, at *3 (W.D.N.C. Aug. 2, 2018) (dismissing declaratory judgment claim as duplicative of breach of contract claim).

## **CONCLUSION**

For all of the foregoing reasons, the First Amended Complaint should be dismissed, in its entirety, and with prejudice.

Respectfully submitted,

By:    _/s/ William P. Davis_
           William P. Davis
           Federal ID No.: 454
           Baker, Ravenel & Bender, LLP
           P.O. Box 8057 (29202)
           3710 Landmark Drive, Suite 400
           Columbia, South Carolina 29204
           E-mail: wdavis@brblegal.com

and

Stephen E. Goldman
    (pro hac vice motion forthcoming)
Wystan M. Ackerman
    (pro hac vice motion forthcoming)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
(860) 275-8200
(860) 275-8299 (facsimile)
sgoldman@rc.com
wackerman@rc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ William P. Davis*_____